UNITED STATES of America, et al.,
Plaintiffs-Appellees,

and

Quinalt Indian Tribe, et al., Plaintiffs-
Intervenors-Appellees,

v.

STATE OF WASHINGTON,
Defendant-Appellant.

No. 84–3571.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 18, 1985.

Decided May 28, 1985.

Donald T. Hornstein, Dept. of Justice, Land & Nat'l Resource Div., Washington, D.C., Susan K. Hvalsoe, Cullen, Holm, Hoglund, & Foster, Olympia, Wash., for plaintiffs-appellees and plaintiffs-intervenors-appellees.

Dennis Reynolds, Asst. Atty. Gen., Olympia, Wash., for defendant-appellant.

Before WRIGHT and TANG, Circuit Judges, and HENDERSON,* District Judge.

EUGENE A. WRIGHT, Circuit Judge:

We must again resolve a dispute arising from the district court's continuing jurisdiction in the Northwest Indian Fisheries litigation. The district court's initial decision apportioning the opportunity to catch fish 50–50 between the Indian tribes and non-Indians is reported in *United States v. Washington*, 384 F.Supp. 312 (W.D.Wash.1974) (*Boldt I*), aff'd, 520 F.2d 676 (9th Cir.1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976).

FACTS

The issues presented on this appeal are tied to the question of salmon escapement on the Queets, Hoh, and Quillayute Rivers in northwestern Washington. In 1982 and 1983, the district court's Fishery Advisory Board (FAB)[1] considered a dispute over the appropriate number of fall Chinook that should be allowed to escape the in-river fisheries and spawn. The Tribes argued that fewer spawners were necessary to produce a Maximum Sustained Yield (MSY) than the number of spawners insisted upon by the State.

In 1982, the FAB developed an interim, data-gathering or "probing plan" to aid in determining the escapement levels necessary to sustain optimum yield. FAB 82–21. Under the plan, a fixed catch-rate of 40% of the run was adopted. As fish density varies from year to year, the fixed exploitation rate was designed to produce a varying range of actual numbers of spawners. These data would then be used by resource managers to determine the escapement levels necessary to achieve MSY.

This fixed-rate exploitation plan was developed without State cooperation, and the State did not challenge the approach in district court. The allocation between Indian and non-Indian fisheries within the 40% exploitation rate was not, however, a factor in the 1982 plan.

In 1983, the court's technical advisor issued a series of separate recommendations for the fall Chinook season on the Queets, Hoh and Quillayute Rivers. FAB Nos. 83–31, 83–33, 83–35. The recommendations concluded that to effectively probe optimum yield, fish determined to be unharvestable by one party must be available for harvest by the other party in order to assure a fixed catch. The advisor noted that the State's claimed right to assign part of its allocation to non-harvest recreational uses would result in exploitation of less than 40% of the run, thereby undermining the FAB's probing plan.

This results from the nature and location of the fisheries. The State hook and line sports fishery is located upstream from the tribal commercial net fishery. Thus, harvestable fish not caught by the sports fishery necessarily result in greater escapement, undermining the fixed catch goal.

* Of the Northern District of California.

1. The FAB was established by the district court's order of October 28, 1975, 459 F.Supp. 1020, 1061 (W.D.Wash.1978), aff'd, 645 F.2d 749 (9th Cir.1981). The Board consists of three members, one selected by the Treaty Tribes, one by the State of Washington, and the court's technical advisor, serving as the nonvoting chairperson. *Id.* If the parties are unable to resolve a dispute, upon request the technical advisor "shall . . . report to the court and all parties, his analysis of the matters discussed in the Board meeting and recommendations, if any". *Id.* at 1062. Either party may then submit a request for review of the recommendation in the district court. *Boldt I,* 384 F.Supp. at 419 (Injunction ¶ 25).

Subsequently, the State filed a request for review of the recommendation in the district court. The State's primary objection was that the interim plan would authorize a tribal catch exceeding its 50% allocation. The State argued that the plan would infringe its opportunity to catch 50% of the harvestable run since a greater tribal catch necessarily reduces the number of fish available to the sports fishery. The district court adopted the advisor's recommendation over these objections by order on December 19, 1983. This appeal followed.

ANALYSIS

I. *Appealability*

The district court adopted the FAB plan by order without certifying its order appealable under Fed.R.Civ.P. 54(b) or 28 U.S.C. § 1292(b). The State challenges it as allegedly impairing the State's equal opportunity to catch available fish. The Tribes argue that the district court order is not final and appealable.

■ Section 1291 of Title 28 gives a right of appeal "from all final decisions" of the district courts. The Supreme Court has identified the policy behind the finality doctrine:

A "final decision" generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.... The foundation of this policy is not in merely technical conceptions of "finality." It is one against piecemeal litigation.

*Catlin v. United States*, 324 U.S. 229, 233–34, 65 S.Ct. 631, 634, 89 L.Ed. 911 (1945). It is sometimes appropriate to give the finality requirement a practical rather than a technical construction. *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 375, 101 S.Ct. 669, 674, 66 L.Ed.2d 571 (1981). *See In Re Coordinated Pretrial Proceedings*, 747 F.2d 1303, 1305 (9th Cir.1984). "[F]inal ... does not necessarily mean the last order possible to be made in a case." *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 152, 85 S.Ct. 308, 311, 13 L.Ed.2d 199 (1964).

This is particularly true when post-judgment orders are involved. The policy against and the probability of piecemeal review is not as decisive a consideration after judgment as before judgment since the underlying dispute is already settled. *See, e.g.,* 15 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure,* § 3916 at 606 (1976); *Joseph F. Hughes & Co. v. United Plumbing and Heating, Inc.,* 390 F.2d 629, 630 (6th Cir.1968) (per curiam); *cf. Kittitas Reclamation District v. Sunnyside Valley Irrigation District,* 626 F.2d 95 (9th Cir.1980), *cert. denied,* 449 U.S. 1079, 101 S.Ct. 861, 66 L.Ed.2d 802 (1981) (finality rule does not bar appellate review of orders issued pursuant to district court's continuing jurisdiction over consent decree in water rights case). Moreover, unless such orders are found final, there is often little prospect that further proceedings will occur to make them final. 15 C. Wright, A. Miller & E. Cooper, *supra,* at 607. *See also SportMart, Inc. v. Wolverine World Wide, Inc.,* 601 F.2d 313, 316 (7th Cir.1979).

■ The Tribes first argue that the district court did not dispose of the allocation issues raised by the State in its request for review. By adopting an interim plan contrary to allocation principles urged by the State, the district court effectively rejected the State's primary contention. Although the court did not join the State in characterizing those proceedings as an allocation dispute, implicit in its decision is the determination that the State's entitlement does not limit the tribal catch to 50% of the available run.

The Tribes next contend that the five-year plan is of an interim nature only, and should not be considered final. This view, however, would eliminate any opportunity for review since by definition the plan will always be "interim." The potential that the State's treaty rights will be infringed by the plan over a five-year period weighs in favor of considering the order final and appealable.

We reject the Tribe's assertion that there are no factual or legal findings to be re-

viewed on appeal. First, the district court adopted the FAB reports in its order. These reports constitute the findings of the court under Federal Rule of Civil Procedure 52(a). In addition, the district court's order resolves the legal issues underlying the plan, leaving only factual determinations regarding yearly implementation to be determined.

■ The United States argues that because the factual record is rooted in 1983, this appeal is moot. The district court's decision, however, not only adopted the factual findings relevant to 1983, it implemented an interim plan which would allow the tribal catch to exceed 50% of the available fish if the non-treaty fishers were unable to harvest their full share. This aspect of the plan will apply throughout its five-year life, and does not depend on annual data. To decline review on this basis would create a situation guaranteed to repeat yet evade review. *See United States v. Oregon,* 718 F.2d 299, 302 (9th Cir.1983).

At oral argument, the United States emphasized the lack of accurate data on prior ocean interceptions. This, the government argued, precludes the State from asserting that the plan allows the tribal share to exceed 50% of the harvestable fish.[2] However, the parties and the FAB have proceeded upon the assumption that the tribal catch would exceed 50% since the projected in-river sport catch was so low. *See* FAB 82–31 at 7. We believe it highly improbable that ocean interception data will alter the allocation substantially enough to reduce the tribal catch to less than 50%. We decline to deny review here in anticipation of further clarification of these figures at some indefinite future date.

**2.** Following are the State's estimated figures for 1983, comparing the allocation of harvestable fish under the plan versus a 50% allocation:

| | Quillayute | Hoh | Queets |
|---|---|---|---|
| 50% tribal share* | 1,921 | 1,004 | 1,266 |
| 50% non-Indian share* | 1,599 | 836 | 1,054 |
| Tribal share under FAB recommendation | 2,770 (71%)** | 1,440 (71%)** | 2,120 (83%)** |

We conclude that, because there is little danger of piecemeal review and because this is the only opportunity for meaningful review, we shall treat the district court's post-judgment order as an appealable final order.

## II. *Allocation*

The district court adopted the FAB's interim plan designed to gather information necessary for determining optimum yield. Under the plan, the Tribes were allowed to exceed their 50% allocation to harvest fish determined to be unharvestable by the sports fishery. The State contends that experimenting with harvest rates by allowing a larger tribal catch violates the State's treaty-secured opportunity to take 50% of the available harvest.

### A. *Background*

In 1854 and 1855, "Isaac Stevens, the first Governor and first Superintendent of Indian Affairs of the Washington Territory, and a small group of advisers," negotiated a series of treaties (Stevens Treaties) with Indian tribes then occupying the Pacific Northwest. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 666, 99 S.Ct. 3055, 3064, 61 L.Ed.2d 823 (1979) (*Fishing Vessel*). These treaties "extinguish[ed] the last group of conflicting claims to lands lying west of the Cascade Mountains and north of the Columbia River in what is now the State of Washington." *Id.* at 661, 99 S.Ct. at 3062.

The Stevens Treaties reserved to the Indians a "right of taking fish." The pertinent language provides:

"The right of taking fish, at all usual and accustomed grounds and stations, is fur-

| | Quillayute | Hoh | Queets |
|---|---|---|---|
| Non-Indian share under FAB recommendation | 750 (29%)** | 400 (29%)** | 200 (17%)** |

\* Adjusted for ocean interceptions.
\*\* Percentage of harvestable share.

The Tribe disputed the State's estimate of prior ocean interception but the parties agreed resolution of this dispute was not necessary for resolution of the instant dispute. FAB 83–31 at p. 7.

ther secured to said Indians, *in common with* all citizens of the Territory...."[3] "In common with" has been interpreted to mean that both treaty and non-treaty fishers shall have the opportunity to take up to 50% of the available run. *United States v. Washington*, 384 F.Supp. at 343. We employed a co-tenancy analogy in upholding the 50–50 split. *United States v. Washington*, 520 F.2d 676, 685 (9th Cir.1975).[4]

**B.  *Tribal Catch Limitations***

The State first contends that the "in common with" language of the Stevens Treaties does not allow the tribal catch to exceed 50% of the harvestable fish, relying on *Fishing Vessel.* Resolution of this issue requires interpretation of the Treaties and is reviewable *de novo.*

In *Fishing Vessel,* the Supreme Court held that "while the maximum possible allocation to the Indians is fixed at 50%, the minimum is not; the latter will upon proper submission to the district court, be modified in response to changing circumstances." 443 U.S. at 686–87, 99 S.Ct. at 3075 (footnote omitted). We have, in subsequent cases, also referred to the 50% allocation in terms that suggest a maximum cap on the Indians' treaty right. *See, e.g., United States v. Washington,* 759 F.2d 1353, 1358 (9th Cir.1985) (en banc); *United States v. Lower Elwha Tribe,* 642 F.2d 1141, 1142 (9th Cir.), *cert. denied,* 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 161 (1981). The State argues that this language precludes the district court from allowing any tribal catch to exceed 50% of the harvestable run. However, this language should not be taken out of context and applied in a manner inconsistent with previously developed sharing principles.

Unlike the present case, *Fishing Vessel* did not involve a situation where the non-

treaty fishery was harvesting less than its full allocation. The "maximum allocation" language should be viewed as addressing a context where each party is capable of taking its full allocation. Indeed, in *Fishing Vessel* the Court also indicated that the 50% ceiling was logically related to the parties' treatment of each other as equals. 443 U.S. at 686 n. 27, 99 S.Ct. at 3075 n. 27; *see also United States v. Washington,* 384 F.Supp. at 343 (" 'in common with' means *sharing equally* the opportunity to take fish"); *United States v. Washington,* 520 F.2d at 685 (referring to Indians and non-treaty fishers as "co-tenants"). Thus, since the Indians' allocation may be reduced for lack of use, equality requires applying the same principles to the non-treaty fishery.

█  This interpretation is also consistent with our co-tenancy analysis in *United States v. Washington,* 520 F.2d at 676. Under property principles, each co-tenant has a right to full use of the property limited only by the other tenant's equal right to such use. *See* Comment, *The Inter Vivos Rights of Cotenants Inter Se,* 37 Wash.L.Rev. 70, 76 (1962). By analogy, if the non-treaty fishers should choose not to use their share of the resource, the Indians should be permitted to take the otherwise unharvestable portion unless doing so would interfere with conservation. *Cf. United States v. Washington,* 520 F.2d at 685.

█  In sum, although each party is entitled to 50% of the shared fishery resource, the 50% figure should be viewed as a ceiling only when there is actual competition for use of the resource. Whether the State's non-harvest use of the resource is a use of the type protected from infringement will be developed more fully below.

---

**3.**  The language is quoted from Article III of the Treaty of Medicine Creek, 10 Stat. 1133 (emphasis added) (*reprinted in Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 674, 99 S.Ct. 3055, 3068, 61 L.Ed.2d 823 (1979)), and is typical of these treaty provisions.

**4.**  For a more exhaustive treatment of the historical background and judicial history of this clause, *see generally* Cohen, *Handbook of Federal Indian Law,* 453–455 (1982 ed.); Comment, *Indian Treaty Analysis and Off-Reservation Fishing Rights: A Case Study,* 51 Wash.L.Rev. 61 (1975); Note *Fishing Vessel Association: Resolution of Indian Fishing Rights Under Northwest Treaties,* 16 Willamette L.J. 931 (1980).

### C. *Non-Harvest Uses*

The FAB concluded that the fixed catch methodology would "reduce the number of fish available for sport fishermen." FAB 83–31 at 2. However, because the estimated resultant decrease in sport catch was minimal compared with the tribal loss, *e.g., id.* (estimated 22 fish sport loss/900 fish tribal loss for Queets River), FAB 83–33 at 2 (estimated 32 fish sport loss/555 fish tribal loss for Hoh River), the plan was approved.[5]

The question becomes whether this reduction in the sport catch, albeit slight, infringes upon the State's treaty rights. We review this issue, which is not "essentially factual" but primarily one of treaty interpretation, *de novo. United States v. Washington*, 730 F.2d 1314, 1317 (9th Cir. 1984) (citing *United States v. McConney*, 728 F.2d 1195, 1201–1203 (9th Cir.) (en banc), *cert. denied,* —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)).

The State argues that its decision to allow its share of harvestable fish to be taken by a relatively inefficient sports fishery, necessarily allowing a greater escapement, is a wise use of its share of the harvestable run and is protected by the Treaty from diminution. The Tribes counter with the argument that the policy against waste of harvestable fish overrides the State's interest. The parties' contrasting positions raise the issue whether yield management of a common resource warrants infringement on one party's non-harvest decision.

Waste of harvestable fish should be avoided. *Fishing Vessel*, 443 U.S. at 663–64, 99 S.Ct. at 3063. In the present case the FAB plan is designed to probe for the harvest level which will minimize waste. Thus, the Tribes' contention that the State's non-harvest-use is waste is premature. However, the general policy against waste does weigh in favor of such a maximum harvest probing plan.

The policy against waste, however, must give way to the State's right to dedicate a portion of its allocation to the inefficient sports fishery, resulting in a greater escapement, if the right is protected by treaty. *See United States v. Oregon*, 718 F.2d 299, 305 (9th Cir.1983) (neither party should be forced to pay too high a price in the name of maximizing yield).

■ The goal of the sports fishery is to provide a sustained recreational experience. *United States v. Washington*, 384 F.Supp. at 383. Yet the policy against waste emphasizes catch, which is not the primary goal of the sports fishery.[6] The State argues that exercise of the opportunity to catch, not harvest, should determine the extent of the right for the sports fishery. We agree that, when the State has decided to dedicate its share of the fishery resource to recreational fishers, it is exercising its right to fish in common with the Treaty fishers. This gives rise to the 50/50 sharing principles first enunciated in the *Boldt I* decision. The Treaty fishers may not infringe on this right by catching more than 50% of a given run when, as here, the tribal fishery is first in place and time.

## CONCLUSION

On remand, if the parties fail to agree, the district court with aid of the FAB must develop a plan that provides necessary data without infringing upon either party's treaty rights. The plan must respect the State's right to allocate up to 50% of any harvestable run to the sports fishery without diminution for failure to harvest all available fish.

■ This judgment is to operate prospectively. The parties have, in good faith, relied upon the prior decisions of the FAB

---

5. Numerical details were unavailable for the Quillayute River, but the FAB said its reasons for approving the fixed catch implementation were "similar in principle to those given for the Queets and Hoh Rivers in FAB 83–31 and 33." FAB 83–35 at 2.

6. For instance, many sport fishers consider the act of catching the fish the primary goal and generally throw the fish back rather than harvest it. *See, e.g.,* Affidavit of Carl Burke, E/R 131.

and the district court, and retroactive application would work substantial hardship upon the Indian fishers. *See McNaughton v. Dillingham Corp.*, 722 F.2d 1459, 1460–61 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 291, 83 L.Ed.2d 227 (1984).

This dispute should have been resolved through cooperation, not litigation. Both parties seek maximum utilization of the resource. This goal will be reached only when the parties work together in harmony, not discord.

REVERSED AND REMANDED.