UNITED STATES of America, et al., Plaintiffs-Respondents, Appellees,

v.

STATE OF WASHINGTON, et al., Defendants-Petitioners, Appellants.

No. 84–3769.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 18, 1985.

Decided Oct. 29, 1985.

for equitable adjustment of salmon catch between treaty and nontreaty fishers, and, that catch made by nonresidents of Washington within state-regulated waters is to be included within the nontreaty share of fish. For the reasons set forth below, we adopt the principle of foregone opportunity, but modify the district court's formulation of that principle. We affirm the lower court's ruling that nonresident catch within State waters is to be counted against the nontreaty share.

Phillip E. Katzen, Evergreen Legal Services, Seattle, Wash., Donald T. Hornstein, Atty., Maria Iizuka, Atty., U.S. Dept. of Justice, Washington, D.C., and Richard Reich, Reservation Atty., Quinault Indian Nation, Taholah, Wash., for plaintiffs-respondents, appellees.

Dennis D. Reynolds, Asst. Atty. Gen., Temple of Justice, Olympia, Wash., for defendants-petitioners, appellants.

Before WRIGHT and TANG, Circuit Judges, and HENDERSON,* District Judge.

TANG, Circuit Judge:

This interlocutory appeal arises from the district court's continuing jurisdiction in the Northwest Indian fishing litigation, *United States v. Washington (Boldt I),* 384 F.Supp. 312, 408 (W.D.Wash.1974), *aff'd,* 520 F.2d 676 (9th Cir.1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). The lower court ruled, *inter alia,* that the defense of "foregone opportunity" may be raised in a proceeding

## I. BACKGROUND

The fishing rights of the Indians and non-Indians originate in the Stevens Treaties, a series of treaties signed in 1854 and 1855, in which fourteen Northwest Tribes gave up certain lands in exchange for certain rights, including the right to fish "at all usual and accustomed grounds ... in common with all citizens of the Territory" of Washington.[1] The treaties have been interpreted so as to require an equal division of the harvestable portion of each run of salmon that passes through "usual and accustomed" fishing grounds. *Washington v. Washington State Commercial Passenger Fishing Vessel Association (Fishing Vessel),* 443 U.S. 658, 685, 99 S.Ct. 3055, 3074, 61 L.Ed.2d 823 (1979); *Boldt I,* 384 F.Supp. at 416–17. Guidelines for the management of the salmonid resource were adopted by the district court in an agreed-upon order, termed the Salmon Management Plan (SMP), in 1978. *United States v. Washington,* 459 F.Supp. 1020, 1107–13 (W.D.Wash.1978), *aff'd,* 645 F.2d 749 (9th Cir.1981).

Presently, the salmon harvest is managed to secure two equally-important objectives: conservation of the species and fair allocation of the harvest between the treaty and nontreaty sides. *See* SMP §§ 1.1, 1.2, 459 F.Supp. at 1108. To assure

---

* Honorable Thelton Henderson, United States District Judge for the Northern District of California, sitting by designation.

1. The treaty language is quoted from Art. III of the Treaty of Medicine Creek, 10 Stat. 1133, and is identical or almost identical to language included in the other treaties. *Washington v. Washington State Commercial Passenger Fishing Vessel Association (Fishing Vessel),* 443 U.S. 658, 674 n. 21, 99 S.Ct. at 3069 n. 21 (1979).

the continued existence of the resource, a certain number of fish are allowed to "escape" to spawn. An "escapement goal" for each run of each species is therefore set by the parties before the beginning of each season. SMP § 4.5, 459 F.Supp. at 1110.[2]

Once escapement levels are established, fishers may catch the remaining "harvestable" portion. *See* SMP § 6, 459 F.Supp. at 1111. Generally each side's fishers are entitled to the opportunity to catch 50% of the harvestable fish. SMP § 1.2, 459 F.Supp. at 1108 (citing *Boldt I*, 384 F.Supp. 312). Allocation of salmon between treaty and nontreaty fishers is computed separately for each of the six species and seven regions of origin of the runs. SMP § 7.1, 459 F.Supp. at 1111.[3] To further implement the harvest objective, the SMP provides for the development of pre-season forecasts of run size for each salmon species and region of origin, and for frequent in-season updating of these forecasts based upon actual catch data. SMP §§ 5, 8, 459 F.Supp. at 1111, 1112. As a fishing season progresses, both sides are aware of the fish remaining to be taken by each party.[4] If estimates indicate an over-harvest in-season, the State may require a "conservation closure" to protect the species. SMP § 9.2, 459 F.Supp. at 1112. After the fishing season is completed, a post-season analysis is made of run size, the actual harvest by each side, and the number of fish allowed to escape for spawning and hatchery purposes.

To remedy over-harvests by either side, the SMP provides for "equitable adjustment," whereby catch imbalances are made up in future seasons. SMP § 7.2, 459 F.Supp. at 1111. Disputes arising under the SMP are submitted in the first instance to the Fisheries Advisory Board (FAB), a dispute resolution mechanism established by the district court. SMP § 11.1, 459 F.Supp. at 1113.

In 1981 and 1982, the last in-season updates indicated that the run size of certain species was greater than earlier calculations had predicted.[5] By this time, the anadromous fish had already reached freshwater and terminal areas [6] where the Tribes fished, as they traditionally have done. Nontreaty commercial fishers, on the other hand, harvested in marine areas.[7] According to the State, it chose to permit commercial fishing in the marine areas only because the quality of the catch deteriorates as the fish near spawning in the terminal areas and because such fisheries allow earlier run size estimates which facilitate management of the resource.[8] The

---

**2.** For natural stocks, the escapement goal is defined as the number of spawning adults needed to produce the maximum number of juvenile salmon that, after incubation and freshwater rearing, will outmigrate to sea. SMP § 4.2.4, 459 F.Supp. at 1110. For hatchery stocks, the escapement goal is that number of spawners needed to meet a hatchery's agreed-upon artificial production plan. SMP § 4.3.1, 459 F.Supp. at 1110.

**3.** The six species are chinook, coho, pink, chum, sockeye, and steelhead salmon. SMP § 2.6, 459 F.Supp. at 1109. The geographic areas recognized as regions of origin for Puget Sound are the Strait of Juan de Fuca, Bellingham Samish Bays-Nooksack-Samish Rivers, Skagit, Stillaguamish-Snohomish, South Puget Sound, Hood Canal, and Canada. SMP § 2.2, 459 F.Supp. at 1108.

**4.** This is done by aid of a computer run by the State. Estimates of harvestable numbers and actual catch are updated weekly, and this information is available to all parties on a daily basis. *See* SMP § 8.4, 459 F.Supp. at 1112.

**5.** The State claims that the last in-season updates were available 24–48 hours before fishing seasons closed. The Tribes demonstrate that for some runs, the final in-season update was announced one week before seasons were closed. (*See* Supplemental Excerpt of Record (Supp. ER), Exhibit PL–M–17.)

**6.** Terminal areas are those areas inland where the salmon return to spawn.

**7.** Nontreaty sports fishers take salmon inland near the terminal areas.

**8.** Significantly, "mixed stock" fisheries take place in the marine areas. Where different stocks of salmon are congregated together, the weaker stocks are protected. Under the SMP, after harvest rates for each species and run are calculated, the lowest rate prevails in mixed stock areas. SMP §§ 6.1, 6.3, 459 F.Supp. at 1111.

Director of the Washington Department of Fisheries (WDF) does, however, have the authority to designate special fisheries inland. Wash.Rev.Code Ann. § 75.12.010(5) (1985 Supp.). The Tribes notified the State that they would harvest the excess fish.[9] The State did not raise any objection through the FAB, as it could have, *see* SMP § 11, 459 F.Supp. at 1113, and opened only one fishery in an attempt to harvest its share of the excess from the runs.[10] The Tribes proceeded to harvest the excess salmon.

The State contends that the nontreaty fishers are owed fish from ten runs. In five of these runs, the Indians harvested more fish than the non-Indians, but less than 50% of harvestable fish.[11] As for the other five runs, the Tribes caught over 50% of the harvestable salmon. These calculations are based upon post-season data.[12] The Indian fishers contend that the State had the opportunity to harvest its share of the excess salmon, but instead "chose" not to harvest. They contend that the State, therefore, forewent its opportunity to har-

vest, and any equitable adjustment would unfairly penalize the treaty fishers.

In 1982, the State began to exclude the catch of nonresidents of Washington harvested within state-regulated waters from the nontreaty share. The Tribes challenge this practice.

The parties were first heard by a federal magistrate who issued a Report and Recommendation. The district court then issued an order from which this appeal is taken. The district court adopted the principle of foregone opportunity and determined that claims for equitable adjustment should be resolved as follows:

First, the decision-maker must determine the actual catch by each party from the run in question by using the best available post-season data.

Second, the share to which each side is entitled must be determined. This will generally be 50% of the total number of harvestable fish for that run as determined from the best post-season data. The share can be different than this 50%

9. The State's position on whether it had notice is unclear. At one point it asserts that it did not have notice; at another, it appears to concede that it did have notice. The record, however, indicates that the State was aware of the Tribes' intention to harvest the excess fish. (*See, e.g.,* Reporter's Transcript (RT) at 258.)

10. The State opened the additional fishery in 1981 in the Nooksack-Samish region of origin in

an attempt to catch its share of the coho harvest.

11. As noted, harvestable fish for a given run equals total fish in a run minus escapement goal. *See* SMP § 6.2, 459 F.Supp. at 1111.

12. The disputed runs are summarized as follows:

| Year | Species | Region | Treaty catch | Non-treaty catch | Escapement goal | Actual Escapement |
|------|---------|--------|-------------|------------------|-----------------|-------------------|
| 1981 | Coho | Strait | 12,873 | 11,804 | 14,300 | 19,200† |
| | | Nooksack-Samish | 98,900* | 68,100 | 15,600 | 42,000 |
| | | South Puget Sound | 228,600 | 223,700 | 39,700 | 107,300 |
| | Chum | Strait | 900 | 0 | 7,000 | 8,259 |
| | | Nooksack-Samish | 19,300 | 5,100 | 20,600 | 66,388 |
| 1982 | Coho | Strait | 52,800* | 16,100 | 12,000 | 21,600 |
| | | Nooksack-Samish | 135,900* | 89,500 | 21,200 | 26,400 |
| | | South Puget Sound | 408,300 | 323,800 | 47,000 | 139,200 |
| | | Hood Canal | 80,900* | 57,100 | 31,500 | 42,400 |
| | Chum | Nooksack-Samish | 44,800* | 22,700 | 27,350 | 45,195 |

* Treaty catch was greater than 50% of total harvestable fish.
† Catch data from all but the 1981 "Coho Strait" harvest is supplied by the State. Escapement goal data is supplied by the United States.

projection if the share is affected by equitable adjustments from previous years. No equitable adjustment would be made unless one party exceeded its share of 50% of the harvestable number of fish. If a party, however, is prevented from harvesting its share due to a conservation closure said party is entitled to an equitable adjustment.

Third, the decision-maker must determine if fish caught by one party (in excess of its share) would have significantly increased the other party's catch if the more successful party had stopped fishing before making the excess catch. The decision-maker must also consider whether the fish not caught would have been surplus to the escapement goal for the relevant run. If the catch would not have contributed significantly to the other party's catch, but would have been surplus to escapement needs, no equitable adjustment would be appropriate.

The district court also concluded that the nontreaty share of salmon is to include the catch of nonresidents of Washington which is harvested within state-regulated waters.

The State requested permission to appeal those two rulings under 28 U.S.C. § 1292(b)(1982). The district court certified the issues for appeal. This interlocutory appeal is properly before us.

## II. DISCUSSION

### A. Standard of Review

■ The issues raised are questions of law, and are reviewable *de novo* by this court. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

### B. Foregone Opportunity Doctrine

The State puts forth two major arguments why the defense of "foregone opportunity" may not be raised in equitable adjustment proceedings.

The State first points to *Fishing Vessel*, in which the Supreme Court interpreted the Stevens Treaties to require an equal division of the salmonid resource between the treaty and nontreaty fishers. 443 U.S. at 685, 99 S.Ct. at 3074. In *Fishing Vessel* the Court stated that, "while the maximum possible allocation to the Indians is fixed at 50%, the minimum is not; the latter will, upon proper submissions to the District Court, be modified in response to changing circumstances." 443 U.S. at 686–87, 99 S.Ct. at 3075 (footnote omitted). The State argues this 50% share represents a maximum, which may not be exceeded by the Indian side.[13]

We have recently rejected the argument posed by the State. In *United States v. Washington*, 761 F.2d 1404, 1408 (9th Cir. 1985), we cautioned that the language from *Fishing Vessel*, to which the State now refers, should not be taken out of context and applied in a manner inconsistent with previously developed sharing principles. *Fishing Vessel* did not involve a situation where the nontreaty fishery was harvesting less than its full allocation, and thus the "maximum allocation" language is to be viewed as a ceiling when there is actual competition for the resource. *Id.*

■ In reaching this determination, we observed that in *Fishing Vessel* the Court took account of the possibility that Indian harvest needs might dwindle, and adjustment would therefore be appropriate. 443 U.S. at 687, 99 S.Ct. at 3075. The Court had also indicated that the 50% ceiling was logically related to the parties' treatment of each other as equals. *Fishing Vessel*, 443 U.S. at 686 n. 27, 99 S.Ct. at 3075 n. 27. We concluded that since the Indians' allocation may be reduced for lack of use, equality required applying the same principle to the non-treaty fishery. *United States v.*

13. The State concedes that in the runs in which the nontreaty fishery did not take more than 50% of the *harvestable number,* the allocation limits established in *Fishing Vessel* are not violated. The State contends, however, that the SMP requires equitable adjustment when one side's *actual catch* exceeds another's.

*Washington,* 761 F.2d at 1408.[14] Therefore, although each party is entitled to 50% of the harvestable salmon resource, this figure does not represent a ceiling when each side is capable of taking its full allocation. *Id.*[15]

The State next argues that adoption of the principle of foregone opportunity improperly modifies the Salmon Management Plan. The State contends that the SMP secures the right to take 50% of the *actual harvest,* rather than an *opportunity* to take 50% of the *harvestable salmon,* and the district court's order violates this requirement. The State next contends that the foregone opportunity doctrine violates the principle of "management imprecision," as embodied in section 7.2 of the SMP and thereby unfairly introduces a new set of rules under the SMP. The State also contends that even if some version of the doctrine were to be accepted by this court, the nontreaty fishers had no "meaningful opportunity" to harvest their share, and are therefore owed salmon. We shall discuss these various arguments in turn.

The State does not dispute that the treaties guarantee each side the opportunity to take up to 50% of the harvestable number of a salmon run, but argues that under the SMP, deficiencies are to be assessed in terms of actual catch. Thus, the State maintains, each side is entitled to 50% of the total catch and the nontreaty side is owed fish from the ten runs in which the treaty fishers caught more salmon.[16]

Contrary to the State's assertion, we do not interpret the SMP as modifying the parties' right, under treaty, to catch 50% of the salmon available for harvest. Rather the SMP is expressly "intended to insure that treaty fishermen and nontreaty fishermen ... shall be accorded the *opportunity to harvest their shares* as determined in [*Boldt I*], 384 F.Supp. 312...." SMP § 1.2, 450 F.Supp. at 1108 (emphasis added). In *Boldt I* the Stevens Treaties were interpreted to permit each side "the *opportunity* to take up to 50% of the *harvestable number* of fish," 384 F.Supp. at 343 (emphasis added); that is, the number of fish remaining to be taken by all fishers after deducting for spawning escapement, *id.* The SMP itself provides that deficiencies in numbers are to be made up "if the treaty or nontreaty fishermen are not provided the *opportunity* to harvest their share of any given run," SMP § 7.2, 459 F.Supp. at 1111 (emphasis added), and thus secures each side the opportunity to catch their share of the harvestable salmon, but does not guarantee redress of imbalances of actual catch.

Were the SMP interpreted as the State would have it, the number of fish to which one side is entitled would depend upon the success or failure of the fishers of the other side. This would place an unacceptable limitation on each party's fishing rights. Thus, in a proceeding for equitable adjustment of the salmon harvest, the share to which each side is entitled is to be determined on the basis of harvestable numbers and not actual catch.

**14.** In *United States v. Washington,* 761 F.2d 1404, the district court's technical advisor had issued a series of recommendations which concluded that to determine effectively the escapement levels necessary to sustain a optimum yield and assure a fixed catch of salmon, the fish determined to be unharvestable by one party must be made available for harvest to the other party. One of the State's objections to the plan was that it would authorize a tribal catch exceeding the 50% allocation under *Fishing Vessel* since the Indian fishers were competing with the less efficient nontreaty sports fishers in the particular locations affected. Although we held that *Fishing Vessel* did not preclude the treaty fishers from fishing into the nontreaty's harvestable portion if that portion were to go unused,

we found that sports fishing, a non-harvest use of the salmon resource, was nonetheless a wise use of the resource which may not be infringed under the treaty terms where the tribal fishery is the first in place and time. *Id.* at 1409.

**15.** The State makes much of the fact that the nontreaty fishers were not "capable" of taking their full allocation. For the reasons set forth below, we disagree with the State on this point.

**16.** In his Report and Recommendation, the Magistrate recommended, without analysis, that each side is entitled to 50% of the total actual catch. The district court did not adopt this recommendation. *See supra* p. 1474.

However, since the treaties and the Salmon Management Plan protect each party's opportunity to catch their respective shares, it must be shown that each side was afforded that opportunity. We agree with the State that the district court's order does not fully respect this principle.

The State argues that the SMP does not take proper account of the fishers' inability to harvest due to "management imprecision." The principle of management imprecision allows for equitable adjustment of harvest deficiencies which result from unexpected management errors. The SMP provides that:

> Both the state and the tribes recognize that fisheries management is not sufficiently precise to provide a prescribed harvest allocation between treaty fishermen and nontreaty fishermen on every run each year. Therefore, if treaty or nontreaty fishermen are not provided the *opportunity* to harvest their share of any given run ..., deficiencies in numbers of fish shall be made up[.]

SMP § 7.2, 459 F.Supp. at 1111 (emphasis added). Under the SMP, then, if one party did not have the "opportunity" to harvest its share because of inaccurate information, that party is owed for the catch imbalance which results.

The district court determined that no equitable adjustment is due unless one party exceeds its share of 50% of the harvestable number of fish, except if prevented from doing so by a conservation closure. The number of harvestable fish is to be determined on the basis of the best available data, including *post-season data*. The State correctly points out that a system, based entirely upon post-season data, does not take proper account of the parties' in-season knowledge and opportunity to harvest their respective shares.

For example, one type of management imprecision occurs when it is discovered after the season that the run size was larger than in-season data had indicated. If one side has caught more than its harvestable share according to in-season data, but less than it could have according to post-season data, that side would not owe fish under the district court's ruling even if the other side was prevented from taking its fair share because of the lack of in-season knowledge that more fish were available.[17]

 Each party can only have the "opportunity" to harvest its share if it has the knowledge in-season to do so. The SMP incorporates this principle under section 7.2 of the SMP and imbalances based solely upon errors in pre-season and in-season run size calculations must be redressed. Therefore, in order to assure that those imbalances which could not have been adjusted in-season due to misinformation are adjusted, the share to which each side is initially entitled is to be based upon *harvestable numbers*, calculated from the best available *in-season* run size data. Other calculations, including actual catch and escapement goals are to be calculated from the best available data, including post-season data.[18] No equitable adjustment would be owed if the party challenged did not exceed its 50% share of the harvestable number of fish, based upon in-season information, unless the less successful party was prevented from taking its share by a conservation closure.[19]

---

**17.** In fairness to the Tribes, they concede that in this type of situation, an adjustment is due to the less successful side. The district court's order, however, would not permit adjustment.

**18.** The best available data must be used to calculate actual catch. If deficiencies are to be assessed, they must be based upon the actual harm suffered by the less successful side. Likewise, escapement goal data must be based upon the best available information. Conservation efforts cannot be thwarted by permitting a party to fish into a less-than-accurate escapement goal.

**19.** By "conservation closure" we mean a closure of fisheries by the State because in-season data indicates that if one side continues fishing, it will fish into the escapement goal. *See* SMP § 9.2, 459 F.Supp. at 1112. One exception to this general rule, is if post-season data indicates a smaller run size than in-season data had indicated. If one side had fished into the escapement goal, although inadvertently, the imbalance would have to be made up, for the less

■ We have yet to address the heart of the State's position which is that acceptance of the foregone opportunity doctrine—a doctrine which holds that if one side foregoes its opportunity to harvest its share of the catch, the other side may do so, so long as it does not fish into the escapement goal—violates the principles and practice under the SMP.

On this point, we cannot agree with the State. If the salmon that one party chooses not to harvest, or is unable to harvest, are identified in-season, and that party has notice that the other party planned to harvest the fish, the foregone opportunity doctrine does not offend, but fully supports and promotes the fishery management and sharing principles developed under the treaties and the SMP.

Principally, the doctrine of foregone opportunity prevents waste of the salmon resource and encourages a full harvest. If it is known in-season that one side is not going to harvest its full share, then prohibiting the other side from harvesting that portion would result in "an irreplaceable waste of the resource." *Boldt I,* 384 F.Supp. at 384. A second reason for encouraging a full harvest is that:

> [O]ver-escapement of fish on the spawning ground can impair the renewability of the resource by causing a condition called 'superdeposition' where the last fish that comes in and spawns either spawns directly over the first brood of eggs ... or digs them up. Superdeposition can destroy eggs outright and also

increase the susceptibility to disease of the eggs remaining.

*Id.*

The Supreme Court has recognized the importance of the full harvest and prevention of waste principles in *Fishing Vessel,* see 443 U.S. at 664, 99 S.Ct. at 3063 (citing *Boldt I,* 384 F.Supp. at 384, 390), as has the Washington Department of Fisheries, *see Boldt I,* 384 F.Supp. at 390.[20] *See also United States v. Washington,* 761 F.2d at 1409.

If one party could not harvest the other's otherwise harvestable portion, the policies of avoiding waste and encouraging a full harvest would be sacrificed without realizing any benefit to other policies. *Compare United States v. Washington,* 761 F.2d at 1409. The doctrine is consistent with the goal of preserving the resource at optimum levels; if one side's harvest cuts into the escapement goal, adjustment is still required, thus deterring excess harvest.[21] In fact, as noted, so long as escapement goals are set at maximum levels, *see* SMP § 4.2.4, 459 F.Supp. at 1110, under-harvests can endanger conservation efforts.

Likewise, the doctrine helps to achieve a fair allocation of the resource between the treaty and nontreaty fishers. We have analogized the parties' relations to those of co-tenants. *United States v. Washington,* 761 F.2d at 1408; *United States v. Washington,* 520 F.2d at 676. Under property principles, each co-tenant has a right to full use of the property limited only by the other tenant's equal right to such use. If nontreaty fishers should choose not to use

successful side would have had no opportunity to catch more salmon since the fish were not present in sufficient numbers.

**20.** The district court has noted that as a matter of policy the WDF "believes that it is not properly managing the salmon resource if fish in excess of the number needed for spawning escape to the spawning grounds." *Boldt I,* 384 F.Supp. at 390. Likewise, an expressed objective of the WDF is to encourage harvesting of the salmon in a manner that provides the greatest return to the economy. *Id.* at 389.

**21.** The State argues that adoption of the doctrine will encourage nontreaty fishers to take

more of their allocated share in the marine areas in anticipation that later data will indicate larger run sizes.

Each party must base its harvest decisions on the best available known data. Harvesting a greater number of salmon than the data indicate are available, in anticipation of unknown excesses, would clearly violate the other side's rights under the treaties and SMP. We are confident that the State would not permit such preemption of the treaty fishers rights, *see Boldt I,* 384 F.Supp. at 401, and would enforce a conservation closure if necessary to achieve spawning escapements.

their share of the resource, the treaty fishers should be permitted to take the otherwise harvestable portion, unless doing so would interfere with conservation. *United States v. Washington*, 761 F.2d at 1408.

Moreover, the record demonstrates that application of the doctrine conforms to past practice under the SMP. In 1978, for example, nontreaty fishers were permitted by the FAB to harvest part of the treaty share of chinook returning to the Bellingham Bay area because the Tribes were unable to harvest their full share. FAB 78–69 (Sept. 7, 1978). Also in 1978, nontreaty fishers were permitted to harvest part of the treaty share of chum returning to Hood Canal because the Tribes were unable to harvest their full share. FAB 78–104 (Nov. 9, 1978).

The record indicates that the Tribes have not requested equitable adjustment when they have been unable to harvest their full share and that the nontreaty fishers have gone forward and fished into the treaty share. Apparently in the past the Indian fishers have had difficulty harvesting their full share of coho, chinook, and chum in the Canadian region of origin. (Reporter's Transcript (RT) at 279.) Because they have been unable to harvest their share, they have not made any claims for equitable adjustment. (RT at 280.) In 1981, for example, the nontreaty fishers caught 103,-700 coho in the Canadian region and the treaty fishers caught 39,000. (RT at 281.) No adjustment was requested by the Tribes. Likewise, in 1981, the Tribes opened a fishery to harvest chum which appeared would not be harvested by the nontreaty fishers. When the WDF objected because it did plan to harvest the chum, the Tribe cancelled the fishery. (RT at 245–47.)

These examples suggest that the doctrine of foregone opportunity has been relied upon in the past to the advantage of the State. The State, therefore, should not be heard to complain when the doctrine works to the advantage of the treaty fishers.

The State additionally argues that the nontreaty fishers had no "meaningful opportunity" to harvest their share because by the time the parties were aware of the excess fish, the salmon had already entered the inland and terminal areas, areas where nontreaty commercial fishers are not accustomed to fishing since they are not permitted to under Washington law. The State contends that the nontreaty fishers did not have the necessary legal authority,[22] time, or gear to harvest the excess fish.

■ The treaty fishers argue that all these constraints represent management *choices*, made by the State, and that they should not have to forego catching salmon which are surplus to escapement needs simply because the State chooses to establish commercial fisheries in the marine areas only.[23] We agree.

The State has made considered policy choices as to how to permit the nontreaty fishers to harvest salmon. If we were to accept the State's position, the result would be waste of the resource. If the treaty fishers could only harvest the excess, subject to adjustments in the future, it would not be in their long term interest to harvest the excess fish. This waste of the resource cannot be permitted.

We observe also that by accepting the Indians' position, the nontreaty commercial fishers may, in some circumstances, harvest their fish alongside the treaty fishers on the Indians' traditional fishing grounds. We are confident, however, that each side will treat the other in good faith and avoid preempting the other's fishery.

In conclusion, the treaties and the SMP protect each party's opportunity to harvest

---

22. State law does permit the Director of the Fisheries Department to open fisheries inland on an emergency basis. *See* Wash.Rev.Code Ann. § 75.12.010(5) (West 1985). The record indicates that the State did open one fishery inland. *See supra* n. 9.

23. Nontreaty fishers are permitted to fish "in common with" the treaty fishers on the Indians' usual and accustomed fishing grounds. They may only be prohibited from fishing on the Indians' reservation lands. *See, e.g., Fishing Vessel*, 443 U.S. at 683–84, 99 S.Ct. at 3073.

their fair share of the salmon resource. Accordingly, the share to which each side is entitled must be based upon *harvestable* numbers, rather than actual catch. However, since the treaties and the SMP protect each side's opportunity to harvest their respective shares, it must be shown that each side was afforded that opportunity. If a party *could not* harvest its share because it did not have the in-season knowledge to do so, then it should not be penalized for imbalances created by such "management imprecision." Therefore, the shares to which each side is due must be calculated upon *in-season run size data.* Actual catch and escapement goal data may be calculated upon the best available data, including post-season data. No equitable adjustment would be due if a party does not exceed its share of 50% of the harvestable number of fish according to in-season data, unless the other party is prevented from harvesting its share due to a conservation closure.

■ If one party catches fish in excess of its share, that party may raise a defense of "foregone opportunity" in an equitable adjustment proceeding. In order to prevail on this defense, it must be shown that (1) the fish taken in excess of its share were identified in-season and (2) the other side had notice that the excess fish would be harvested.

## C. Catch of Nonresidents Within State-Regulated Waters

With respect to the issue of the inclusion of the catch of nonresidents of Washington, caught within state-regulated waters, in the nontreaty share, the State contends that *Fishing Vessel* controls. 443 U.S. at 688, 99 S.Ct. at 3075. The Magistrate's Report reflects agreement with this view, as he recommended that the holding of *Fishing Vessel* "impliedly reflects a determination that the catch of the Treaty Tribes is to be balanced against the catch of other residents of Washington, but not that of non-residents." (Emphasis added.) However, the Court in *Fishing Vessel* addressed a factual situation involving the taking of fish by Washington residents in federally-regulated waters and held in that context that such fish should be counted against the State's share. The Court did conclude that any fish "taken in Washington waters ... by either members of the Indian tribes that are parties to this litigation, on the one hand, or by non-Indian citizens of Washington, on the other hand, shall count against that party's respective share of the fish." *Fishing Vessel,* 443 U.S. at 689, 99 S.Ct. at 3076. Because there was no issue pertaining to nonresidents in the case, the Court's reference to Indians and non-Indian residents cannot be taken as an exhaustive or exclusive list of all the persons whose catch might affect computation of the share allocation of harvestable fish. Since the Supreme Court has not decided the issue, we must decide whether nonresidents' catch should count against the State's share.

■ We conclude that the purpose and intent of the treaties, and the language of the treaties, when interpreted in light of the traditional canons of treaty construction, as well as the practicalities of contemporary state management of its fishery resources, mandate inclusion of the catch of nonresidents in the nontreaty share.

The relevant treaty language provides: "The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory."[24] The meaning of the phrase "citizens of the Territory" is the crux of the issue we must decide. The original purpose and intent of the Stevens Treaties was to govern Indian and non-Indian salmon fishing. Nothing in the history of the treaty negotiations suggests that "citizens of the Territory" was understood to be a more limited group than non-Indians in the Territory. The Indians were giving up a valuable right to land in exchange for the assurance they could continue to fish without interference from the whites coming into their ancestral lands. *See, e.g., Boldt I,* 384 F.Supp. at 355. The Indians were preserving a right against

**24.** *See supra* n. 1.

non-Indian encroachment, and were not aware of the existence or implications of subtle political classifications of citizenship or residency. The contracting parties in each treaty were the Indian tribes on the one hand, and the United States on the other. As Judge Boldt found:

> The treaty language "in common with all citizens of the Territory" was probably introduced by George Gibbs, who was a lawyer and advisor to Governor Stevens. There is no discussion of the phrase in the minutes of the treaty councils, in the instructions to Stevens or to the treaty negotiators, or in Stevens' letters of transmittal of the treaties. There appears to be no phrase in [t]he Chinook jargon that would interpret the term in any exact legal sense.

*Boldt I*, Finding of Fact 23, 384 F.Supp. at 356 (citations to the record omitted).

The phrase "citizens of the Territory" was used in only some of the treaties negotiated with the Indians of the Pacific Northwest in 1854 and 1855.[25] In the others the negotiators used the interchangeable expression "citizens of the United States."[26] We do not think that some treaties bound the citizens of Washington while others bound citizens of the United States since the real concern at the time the treaties were negotiated was to clarify the rights of Indians and non-Indians who would fish at Indian fishing places.

Treaties with the Indians are to be interpreted as the Indians themselves would have understood them. *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615 (1970); *Tulee v. Washington*, 315 U.S. 681, 684–85, 62 S.Ct. 862, 864, 86 L.Ed. 1115 (1942). Treaties must be liberally construed to accomplish their protective purposes, and any ambiguities are to be resolved in favor of the Indians. *Oregon Dep't. of Fish and Wildlife v. Klamath Indian Tribe*, —— U.S. ——, 105 S.Ct. 3420, 3428, 87 L.Ed.2d 542 (1985); *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973); *Carpenter v. Shaw*, 280 U.S. 363, 366–67, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930). A properly liberal construction of "citizens of the Territory" requires that it be read to include nonresidents fishing within State-regulated waters. Any narrower interpretation would defeat the intent and purpose of the treaty to protect Indians' fishing rights from non-Indian encroachment. Such a narrow interpretation would impermissibly allow the State to license nonresidents to harvest fish in Washington waters bound for tribal fishing areas, not count them as part of the nontreaty share and thus, in effect, to license non-Indians to diminish the Indians' treaty share.

Counting the catch of nonresidents against the nontreaty share recognizes the realities of State regulation and management of its resources. The State is in a position to regulate or restrict nonresident as well as resident non-Indian fishing to achieve a fair apportionment of the State's 50% share.

### III. CONCLUSION

Treaty interpretation is the province of courts. Fishery management is not. In this case we have been called upon to do both. We prefer, however, to see these disputes resolved by the parties. We therefore remand to the district court with instructions first to direct the parties to negotiate a resolution of the State's claims for equitable adjustment under the guidelines we have set forth.[27]

AFFIRMED except as modified.

---

**25.** *See, e.g.*, Treaty of Medicine Creek, 10 Stat. 1132; Treaty of Point Elliott, 12 Stat. 927; Treaty with the Quinault, 12 Stat. 971; Treaty with the Yakima, 12 Stat. 951; Treaty with the Nez Perce's, 12 Stat. 957; Treaty with the Flatheads, 12 Stat. 975.

**26.** *See, e.g.*, Treaty of Point no Point, 12 Stat. 933; Treaty of Neah Bay, 12 Stat. 939; Treaty with the Walla-Walla, Cayuses, and Umatilla Tribes, 12 Stat. 945; Treaty with the Tribes of Middle Oregon, 12 Stat. 963.

**27.** The Tribe's request for attorney fees under 42 U.S.C. § 1988 and 28 U.S.C. § 1927 is denied. Each party shall bear its own costs and attorney fees.