THE CHOSEN FREEHOLDERS OF HUDSON COUNTY v. THE STATE, (THE NEW JERSEY RAIL ROAD AND TRAN. CO., PROSECUTORS.)

1. Any tribunal, in proceeding in a matter which affects the rights of individuals or corporations, ought to give notice to the parties to be affected.

2. If any proceeding of a municipal corporation be had at an adjourned meeting, it will be presumed, until the contrary appear, that the meeting was rightly adjourned. It is not necessary that the facts showing the proper convening of such corporation should appear in every resolution of the body, or upon the face of the proceedings when any part is removed by *certiorari*.

3. Conferring on a Board of Freeholders, or other body, the power to fix rates of ferriage is not a delegation of the legislative power, vested by the constitution in the legislature.

4. The power given by the act of 1799, to the Boards of Chosen Freeholders, to regulate rates of ferriage, applies to ferries of which only one landing is in the county, and the other landing in another county or state —each county may regulate the fare to be taken at the landing within it.

5. The regulation of tolls on bridges and turnpike roads, and fares on rail roads and ferries, which are used for communication and commerce ·between states, is part of the powers reserved to the states, and is not delegated to the general government.

This was a writ of error to the Supreme Court to remove the proceedings and judgment of that court upon a resolution or ordinance of the board of chosen freeholders of the county of Hudson. This ordinance fixed the rates of ferriage over the ferry from Jersey City to New York, known as the Jersey City ferry. The Supreme Court, by their decision, (3 *Zab.* 206,) affirmed the proceedings of the freeholders.

Argued by Mr. *Whitehead* and Mr. *I. W. Scudder* for the plaintiffs in error, and by Mr. *Zabriskie* and Mr. *Dayton* for the defendants.

The opinion of the court was delivered by

ELMER, J. Several reasons for reversing the judgment of the Supreme Court have been insisted on, which I will consider in the order they were presented.

The first was, that the order of the board of freeholders, brought up by the *certiorari*, was made at an adjourned

meeting of the board, and that no notice was given to the owner or keeper of the ferry to attend, and be present at the consideration of the matter.    I am strongly inclined to the opinion that notice was necessary, and had this reason been assigned before the Supreme Court, and had it appeared that the order was in fact made in the absence of such owner or keeper, and of his agent, without notice to him, and an opportunity to attend and be heard, I should have been disposed to hold that we ought to reverse the judgment of the Supreme Court, and vacate the order complained of.    It is a dictate of natural justice, that when an act is to be done by a court, or other authority, which is specially to affect a particular individual, reasonable notice should be given to him, so that he may appear and be heard, if he thinks proper.    But I do not think this question is properly before us, it not having been presented to the court below.    2 *Wend.* 146.

The second reason for reversal was, that it does not appear upon the face of the order itself, or in the record of the proceedings of the board, that the adjourned meeting was regularly held.    This is not a case where the act of the freeholders fixing the rates, was required to be made out in any particular form, and signed by the members or officers of the board.    It is an act done by an incorporated board, to which is committed the regulation of most of the matters pertaining to the county, which meets annually, on a day fixed by law, at the court house, and which has a general power to adjourn from time to time, as may be deemed necessary.    This board is required annually to elect a clerk, whose duty it is to keep the minutes, and enter the orders and proceedings of the corporation, in a book to be kept for the purpose, and who is sworn faithfully to perform his duties.    The *certiorari* is directed to the board, and in obedience to its command, a resolution purporting to be made at an adjourned meeting, and entered in the minutes is duly returned.    I am aware of no principle which forbids us to act upon the presumption, applicable to courts of justice, and I think to public bodies entrusted with gene-

ral powers like these boards, that the adjournment was regularly made. But whether this be so or not, it appears by the book of minutes, which was proved and made an exhibit in the cause, that the adjournments were in fact, from time to time, regularly made, from the day of the annual meeting to the adjourned meeting when this resolution was adopted. The argument for the plaintiffs seemed to be, that the order or resolution ought itself to embody all the facts necessary to show that it was duly made. In my opinion that is not necessary. The resolution does not derive its authority and is not authenticated as a paper signed or made out by a special authority, acting in that particular matter only, but is authenticated by the entry in the minutes made by the proper officer, and is one of many acts of a body having powers of a general nature, which they are competent to perform, at a stated or adjourned meeting, as they may think advisable.

It was thirdly insisted, that the constitution of this state vests all legislative power in the senate and general assembly ; that the power of regulating ferries is a legislative power, and cannot therefore be delegated to any subordinate body. The act of the legislature vesting this power in the boards of freeholders was passed in 1799, long before the adoption of the existing constitution. That constitution, providing in general terms for a legislative department of the government, directs that the legislative power shall be vested in a Senate and General Assembly. This provision was not designed either to enlarge or restrict the power itself; but simply to designate by what bodies it should be exercised. Legislative powers, and subordinate powers proper to be exercised by municipal or other corporations, or by judicial or other officers, were left just as they stood before. The power of the boards of chosen freeholders to fix rates of ferriage, like that given to the county courts, to prescribe the rates and prices of tavern fares, is subject to the control of the legislature, and cannot be considered with more or even so much propriety, a delegation of legislative power, as the power of making by-laws, which belongs to every

corporation, and which in the cases of cities and other municipal bodies, embraces a very wide range. These boards, which are in fact municipal corporations, public and political bodies, have vested in them and have constantly exercised, without doubt or question, the power of levying taxes and other powers, much more of the character of legislation than that now in dispute.

A fourth reason for reversal, and the one most relied on, was, that the ferry whose rates are attempted to be regulated, is not such a ferry as is contemplated by the act, which applies, it is insisted, only to ferries, both of whose termini are within the same county. A ferry it is said, necessarily includes a right to both sides of the river, either of absolute ownership, or at least of a right to land passengers, and consequently means the whole passage across the river. *Peter* v. *Kendall*, 6 *B. and C.* 703. Hence it is argued that the act concerning ferries, (*Rev. Stat.* 542,) which empowers the boards of chosen freeholders, to fix the rates to be taken at the several ferries, within their respective counties, applies only to such ferries as are entirely within a particular, county.

It is alleged that contemporaneous usage has thus interpreted the act, this being the first instance of an attempt to apply the act to the ferries across the Hudson. Such may be the fact in regard to the Hudson; but the minutes of the board of freeholders of the county of Gloucester show, that as long ago as the year 1821, that board adopted resolutions prescribing the fares to be taken at the ferries across the Delaware in the then township of Newton, now the city of Camden; and these resolutions were acquiesced in, without question, so far as regarded the construction of the act.

When the act was passed, long before the invention of steamboats, ferries were generally the property of one or two individuals, established for the public convenience and private gain, by the owners of the shore, sometimes by virtue of a grant or law, and sometimes without any public authority. The owner or keeper resided on the one bank or the other of the river over which the ferry passed, and

kept his boats and other apparatus where he resided.   The ferry was commonly known and designated by the name of the place from which it started, and where such owner resided, as Paulus Hook ferry ; or from the name of the owner or keeper, as Dunk's ferry, Corriel's ferry, &c.   In many cases, where the river was not too wide, a bell or horn, or some other signal was established on the side of the river opposite to that where the owner lived, so that persons coming there who desired to pass over, could make known their wishes.   Probably but few, if any of the keepers had a boat constantly running, or started at any particular hour.   In some cases, there were ferry owners on both sides of the river ; but the ferry or ferries on each side were considered and spoken of as distinct ferries, and had distinct owners or keepers.   This was the case with most, if not all, the ferries between Philadelphia and what is now called Camden ; and the ferries on each side were regulated and governed by the laws of the state in which such owner or keeper resided.   Sail and row boats, and flats or scows, were the vessels in use, as is manifest from the act itself.

Applying the language of the act to the state of things then existing, and giving to that language its common and ordinary signification, as is the rule in the interpretation of statutes, where nothing indicates a different intention, I think it cannot be doubted, that in treating of ferries, the legislature had in view the ferry establishment, and not the way across the water.   The act meant to authorize, and did authorize the boards of freeholders in the several counties, to regulate the fares to be taken at the ferry situate within that county ; that is, at the ferry establishment of the owner or keeper.   The rates, when established, apply to and are obligatory upon such owner or keeper, who is required by the second section to put up and maintain, where such ferry is kept, a post with a table of rates, fairly printed, written or painted.   Even if it might happen, upon this construction, that one board might establish one set of rates at one side, and another board another set on the other side, or that each state might have different regulations, where the ferry

was over one of the rivers forming the boundary between this and another state, I do not see that there would be any important conflict of authority. Each power regulated what was done within its own jurisdiction, and left to others to regulate what was done in theirs. Existing ferries between this state and New York, and this state and Pennsylvania are now, in numerous instances, regulated by the laws of this state, without the occurrence of any difficulty.

All the legislation of the state, from its earliest history, serves to confirm this view of the subject. The ferry at Communipaw was established in 1661, and regulated by Governor Carteret in 1669, and rates prescribed. Afterwards, the ferryman was elected by the people. *Whitehead's East Jersey, p.* 161. In 1682 commissioners were appointed in each county, and among others, for Bergen, to set and appoint highways, bridges and ferries. *Spic. & Leam.* 256. In 1693 an act was passed, empowering the justices of the county of Cape May to erect and set up a ferry at Great Egg Harbor, and establishing certain rates of ferriage. *Spic. & Leam.* 516. At that time, as now, the river over which this ferry extended, was the northern boundary of the county, the other side being out of its jurisdiction, and from that day to this, the ferry has been maintained.

Without deeming it necessary to go over and specially refer to the different acts noticed in the opinion of Judge Carpenter, delivered in this case, it is sufficient to say, that they show a course of legislation, commencing in 1714, and continued till near the passage of the act of 1799, by which the ferries over the waters dividing this state from the adjoining states, were regulated by the laws of New Jersey, in those cases where ferry establishments were within this state. These laws operated upon the ferry owners and keepers, when acting and receiving fares, within this state, and were superseded by the act now in question, which is general in its terms and applies to all ferries in the state, and repeals all prior acts within its purview. One of the objects of the act was to vest in the local boards, then newly organized and of a popular character, the power previously exercised by

the legislature.   To effect this object, the word ferries must be interpreted to mean, what in those laws it had obviously included, ferries the owners or keepers of which resided in this state, or which had one of their termini where fares were demanded, in this state, and not merely ferries in the technical meaning, of an entire passage across a river or other water. How far the rates established by previous laws, or by virtue of the act of 1799 extend, and whether they apply at all to fares taken at a terminus of the ferry out of the jurisdiction of the regulating power, are questions not now before us, and not necessary to be considered.   It may be remarked, however, that the resolution in question, purports to regulate the fares to be taken at the Jersey City ferry.

In the case of *The People* v. *Babcock*, 11 *Wend.* 587, the Supreme Court of the state of New York decided that a ferry between that state and Canada, over the Niagara river, must be licensed by the court of Common Pleas of the county in which its terminus within that state was.   The New York statute, so far as this question is concerned, is similar in its provisions to ours, and I think the decision of the court was correct in principle.   I am satisfied that the New Jersey statute applies, in like manner, to all ferries having one terminus in the state, and consequently that the board of freeholders of the county of Hudson, has power to fix the rates of those between this state and the city of New York.

Some effort was made by the counsel for the plaintiffs to show that the act of 1799 is obsolete, and that its provisions are not applicable to ferries carried on by means of 'large steam-boats; and an argument in favor of that view was drawn from the fact that many, perhaps most of the existing ferries where steam-boats are used, have had their fares regulated by special acts.   These acts, however, are mostly, if not in every instance, acts incorporating companies, in which the fares are incidentally prescribed, and in most cases are lower than had been before charged.   It is undoubtedly true, that some of the provisions of the act of 1799, are now inapplicable to some ferries ; as for instance,

those which require the ferryman to be well provided with flats and wherries, furnished with sail and setting poles, such implements being superseded by others far better adapted to the purpose. And it may be true that in cases where the fares are regulated by the incorporating or other special act, the general law is so far repealed; but the Jersey City ferry, although once carried on by a company whose fares were prescribed by a law which has expired, is now without any other regulation than that imposed by the resolution complained of. Those provisions of the act of 1799, which empower the boards of freeholders to fix the fares, are as applicable now as ever they were. Whether this power could be more judiciously exercised by some other tribunal, or by the legislature, it is not for us to say. The law still remains unrepealed, and so far as its provisions, or any of them apply, it is the duty of the courts to give them effect. That the legislature has in fact interposed, and in many instances prescribed rates in special cases, does not affect the statute in cases where they have not interposed. All the special acts do not in fact fix the ferry rates. In the act of 1824, to incorporate the Perth Amboy ferry company, (*Pam.* 32,) it is provided : "That the rates of ferriage at the said ferries shall not exceed the rates now or hereafter to be established thereat according to law." And in the act of 1849, authorizing a ferry from Fort Lee to New York, over the Hudson, it is enacted that the owner of said ferry may take such fare "as may be fixed by the board of freeholders of the county of Bergen, according to the provisions of an act entitled 'an act concerning ferries,' " passed February 6, 1799. Both these acts refer to the act in question, and treat it as applicable to cases where one terminus of the ferry is in another state. After such a legislative recognition of this law, it must be a very strong necessity that will justify the judiciary in treating it as obsolete, or as inapplicable to any ferries but such as have both their termini in the same county.

When or how the ferry at Jersey City, now carried on by the New Jersey Rail Road and Transportation Company, who are, in the language of the act, the keepers of it, and

who by prosecuting this *certiorari*, acknowledge themselves to be so, was established, does not distinctly appear. It is undoubtedly of very ancient date, and is referred to in various acts of the legislature, as an existing ferry. Although a ferry, in its technical sense, is a public highway, and cannot legally be established by the owner of the land bounding on the shores, without a license from the government, to whom it belongs, as a part of the police in which the public have an interest, to authorize the taking of fares, it is probable that some ferries have been established in this state by individuals who never had a license, and that being of great public utility, they were generally acquiesced in, and the fares demanded were so reasonable, that no regulation of them by law was ever required. Whether this ferry was one of that description, it is not necessary to inquire. The owner or keeper of a ferry certainly cannot be permitted to say that his ferry is illegal. If set up without public authority, it was liable at any time to be stopped, or in the discretion of the legislature to be regulated. Neither the putting down of an unauthorized ferry, nor the prescription of the rates of fares to be taken at a licensed or unlicensed ferry, is any infringement of private property, because no one has any private property in a public ferry, or other public highway, unless it has been granted to him by lawful authority. The same power that grants may prescribe rules. A license to establish a ferry at a particular place, would not authorize landing on the property of a riparian proprietor; but if the private property is taken for the public use, and converted into a highway down to the water's edge, the ferry, which is only another mode of continuing the public highway over the water, does not affect private property. According to the case of *Peter* v. *Kendall*, before cited, it is not necessary that the ferry owner should own the land at either terminus, or have any interest in it. It is therefore immaterial by what authority this ferry was established, or is now continued, or whether the keepers of it do or do not own the terminus, or whether the terminus is a public highway or not. It is sufficient to authorize these rates, that it is

a public ferry, and that there is no law prescribing rates for it, inconsistent with the exercise of the power by the board of chosen freeholders.

The remaining reason urged for setting aside the order of the freeholders was, that it is a violation of the constitution of the United States ; and, if I rightly understood the argument, on two grounds.    First, it was alleged, that the law impairs the obligation of a contract.    That a contract exists, by which the state is bound not to interfere with the rates to be taken at this ferry, is attempted to be inferred from the fact that the ferry exists, and long has existed. Being a very ancient ferry, it is said, it must be inferred that it was anciently granted to some body.    Who is the owner of the ferry now, does not appear.    The prosecutors possess it, and their right is not questioned.    Supposing it to be a fair inference that there was anciently a grant of it, as private property, I do not see how it follows, that it is also to be inferred that it was one of the terms of the grant that the owner may take such fares as he pleases.    That a grant of a ferry in England implies no such right, is admitted.    So long as no regulation on the subject is prescribed, the grantee has undoubtedly a right to take reasonable fares, and no more.    But it belongs to the government to say what are reasonable.    It is not alleged in this case that any grant was ever made which, as a part of its terms, authorized any particular fares.    It is not even shown that any particular fares have been long and uninterruptedly in use.    Giving full weight to the argument, that the circumstances show an ancient grant, upon which no opinion is meant to be intimated, I think the true inference, in the absence of any proof to the contrary is, that it was made subject, like other ferries, to be regulated by law, in regard to fares and all other matters in which the public have an interest.    Whether this or any other ferry in New Jersey is now, or ever was, a franchise in the strict, common law meaning of that term, so as to give an exclusive right, it is unnecessary now to decide.    If it be such a franchise, it is subject to the police regulations of the government, as well in regard to fares, as to other matters.

The case of *Charles River Bridge* v. *Warren Bridge*, 11 *Peters* 420, establishes the doctrine that grants by the legislature are to be construed strictly, and that it is not to be inferred from the granting of a charter of incorporation, which contains no stipulation against applying the general powers of the government to the business of such corporation, that such powers cannot be exercised, even although the effect of exercising them may be to destroy or render of no value the charter itself. Upon the same principle, if it be true, that this ferry was granted, no contract, not so to exercise the general power of regulating the fares can be inferred. For anything that appears to the contrary in this case, the fares actually prescribed so far from proving an injury, may actually benefit the ferry keeper.

But it was insisted also, that the ferry in question, as now used, is a part of the means of carrying on commerce between two states of the Union, and that a regulation of the rates of fare for carrying passengers and goods is, in effect, a regulation of commerce, which belongs exclusively to congress. The same objection was made in the case of *The People* v. *Babcock*, and I entirely agree with the Supreme Court of New York, in holding it to be of no force. Whether the power of regulating commerce between the states is to be considered as vested exclusively in congress, so that the legislatures of the several states cannot constitutionally pass any law on the subject, although it may not conflict with any existing treaty or law of the United States, has not yet been authoritatively settled by the Supreme Court of the United States. But conceding it to be so, the regulation of the tolls of bridges and turnpike roads, and the fares of rail roads and ferries, is in no just sense a regulation of commerce, and has never been so regarded. It is a part of that general power of police, essential to every state, and which could not be with safety, and has not been, surrendered to the general government. Such was the opinion of Chief Justice Marshall in the case of *Gibbons* v. *Ogden*, 9 *Wheat.* 203. Justice McLean, who is a strenuous advocate of the

doctrine, that the power of congress to regulate commerce, excludes the power of the states to legislate on the subject, in the case of *Smith* v. *Turner, 7 Howard* 393, says: " a state cannot regulate commerce, but it may do many things which more or less affect it.  It may tax a ship or other vessel used in commerce, the same as other property owned by its citizens. A state may tax the stages in which the mail is transported ; but this does not regulate the conveyance of the mail, any more than taxing a ship regulates commerce.  An inquiry is made whether congress, under the power to regulate commerce among the several states, can impose a tax for the use of canals, rail roads, turnpike roads and. bridges, constructed by a state or its citizens?   I answer, that congress has no such power.   The United States cannot use any one of these works without paying the customary tolls."

In the case of *Cooley* v. *Board of Wardens of Philadelphia*, 12 *How.* 319, Judge Curtis, delivering the opinion of a majority of the court says : " Now the power to regulate commerce embraces a vast field, containing not only many but exceedingly various subjects, quite unlike in their nature ; some imperatively demanding a single uniform rule, operating equally on the commerce of the United States in every port ; and some like the subject now in question, as imperatively demanding that diversity which alone can meet the local necessities of navigation.  Whatever subjects of this power are in their nature national, or admit only. of one uniform system, or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by congress. That this cannot be affirmed of laws for the regulation of pilots and pilotage is plain."

That the state may regulate the tolls and fares on turnpike and rail roads and ferries, wholly within its jurisdiction, counsel have not gone so far as to deny.  But such regulations will, in many cases, affect the commerce among the several states, as much as the regulation of tolls at a ferry directly between two states.  A large part of the commerce between Philadelphia and New York passes by means of the

roads and canals through New Jersey, which latter state has always regulated the tolls without question. . If the states separately or jointly, cannot regulate a ferry between two of them, neither can they authorize the building of a bridge, or prescribe the tolls for passing it.   These, and the like powers, have been exercised by most of the states of the Union, without doubt or hesitation, from the adoption of the constitution to the present day, and are, in my opinion, in no wise repugnant to the provisions of that instrument.

In my opinion, none of the reasons urged for setting aside the order of the freeholders, prescribing the rates of ferriage to be taken at the Jersey City ferry are valid, and I am therefore in favor of affirming the judgment of the Supreme Court.

The judgment of the Supreme Court was unanimously affirmed.

*For Affirmance*—Judges ELMER, HAINES, POTTS, VALENTINE, RISLEY, OGDEN, WILLS, and the CHIEF JUSTICE.

> CITED *in State* v. *Jersey City*, 4 *Zab.* 666; *State* v. *D., L. & W. R. R. Co.,* 1 *Vr.* 478; *State* v. *Town of Union*, 3 *Vr.* 345; *State* v. *Morristown*, 5 *Vr.* 451; *State* v. *Trenton*, 7 *Vr.* 501; *Columbia Del. Bridge Co.* v. *Geisse*, 9 *Vr.* 43.