157 F.3d 762
 98 Cal. Daily Op. Serv. 7682, 98 Daily Journal
D.A.R. 10,657
Ronald CREE, Jr.; Dalton Cree; Jack Haggerty; Douglas
Beebe; Joseph Yallup; Carl Boyle; Richard "Kip" Ramsey,
dba Tiin-Ma Logging Co.; Tiin-Ma Logging Company; Wheeler
Logging, Plaintiffs-Appellees,
and
Yakama Indian Nation, Plaintiff-Intervenor-Appellee,
v.
Juan FLORES; Mike Worlund; Keith Qunell, Defendants-Appellants.
WHEELER LOGGING, Plaintiff-Appellee,
and
Yakama Indian Nation; Delbert Wheeler,
Plaintiffs-Intervenors-Appellees,
v.
Annette SANDBERG; Mike Worlund, Defendants-Appellants.
 No. 97-35305.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 6, 1998.
Decided Oct. 8, 1998.
 
 Fronda Woods, Assistant Attorney General, Olympia, Washington, for defendants-appellants.
 Tim Weaver, Cockrill & Weaver, Yakima, Washington, for plaintiffs-appellees Ronald Cree, Jr., et al. and plaintiff-intervenor-appellee Yakama Indian Nation.
 Jack W. Fiander, White Swan, Washington, for plaintiff-appellee Wheeler Logging and plaintiff-intervenor-appellee Delbert Wheeler.
 Stephanie L. Striffler, Special Counsel to Attorney General, Salem, Oregon, for amicus curiae State of Oregon.
 Appeals from the United States District Court for the Eastern District of Washington; Alan A. McDonald, District Judge, Presiding. D.C. Nos. CV-89-00458-AAM, CV-92-03100-AAM.
 Before: CANBY and TASHIMA, Circuit Judges, and TAKASUGI, District Judge.*
 TASHIMA, Circuit Judge:
 
 
 1
 Defendants, various Washington State officials ("Defendants"), appeal the district court's grant of summary judgment in favor of the Yakama Indian Nation and individual Yakama Indians holding that the Treaty with the Yakamas ("Yakama Treaty" or "Treaty") exempts them from various Washington truck license and overweight permit fees. The Treaty clause in issue assures the Yakamas "the right, in common with citizens of the United States, to travel upon all public highways." Treaty with the Yakamas, Art. III, 12 Stat. 951, 953 (1855).[1] We hold that the district court did not err in interpreting the Yakama Treaty as exempting the Yakama Indians from the fees at issue. Accordingly, we affirm the judgment of the district court.I. BACKGROUND
 
 A. Factual Background
 
 2
 Washington law requires registration and licensing of trucks according to gross weight, higher fees being charged for greater weights. See RCW §§ 46.16.070, 46.16.135 (monthly tonnage licenses), 46.44.095 (temporary tonnage permits). Trucks owned by individual Indians have never been exempt from such license fees. Washington also requires log tolerance permits for certain overweight trucks along with payment of a fee. RCW §§ 46.44.047, 46.44.095 (temporary tonnage permit). Again, individual Indians have never been exempt from such fees. Under Washington law, violations of the weight licensing requirements may result in traffic infractions. RCW §§ 46.16.010, 46.16.135, 46.16.140, 46.16.145. Fees paid to the State of Washington (the "State") for truck registration, licensing, and log tolerance permits are credited to the state motor fund and used primarily for highway purposes. RCW §§ 46.68.030, 46.68.035. See generally Yakama Indian Nation v. Flores, 955 F.Supp. 1229, 1232-33 (E.D.Wash.1997).
 
 
 3
 Plaintiff-Intervenor Yakama Indian Nation (the "Yakama Nation" or "Nation") sells timber from lands held in trust by the United States for its own and its members' benefit. It enters into timber sales contracts with purchasers who must employ tribal members when possible. Individual Plaintiffs in both consolidated cases operate logging trucks that haul logs from tribal timber sales within reservation lands to off-reservation mills. Cree plaintiff Richard "Kip" Ramsey owns the Tiin-Ma Logging Company ("Tiin-Ma Logging") and began his logging business in 1978, becoming the first Indian logger to haul tribal timber off-reservation. The remaining Cree plaintiffs are employed as drivers for Tiin-Ma Logging and, with one exception, are enrolled members of the Yakama Nation. In the second consolidated case, Wheeler, Plaintiff-Intervenor Delbert Wheeler is the owner of Plaintiff Wheeler Logging and is an enrolled Yakama Indian who began his operations in 1987.
 
 
 4
 Defendants are state officers authorized to issue traffic citations for violations of State vehicle registration, licensing and permitting statutes. Plaintiffs brought suit after the officers issued traffic citations to Tiin-Ma Logging and Wheeler Logging drivers because their owners had refused to pay applicable tonnage licensing fees and had not obtained log tolerance permits for their trucks. Afterwards, the officers began issuing citations to the drivers for failing to possess proper registration. All of the state enforcement actions challenged in this case occurred outside the boundaries of the Yakama Indian Reservation.
 
 B. Procedural Background
 1. First Proceedings in the District Court
 
 5
 Plaintiffs contend that the Yakama Treaty protects their right to haul tribal timber to off-reservation markets over state highways without restriction; therefore, that the State cannot impose licensing and permitting fees on logging trucks owned by the Nation or its members. They contend that Defendants have deprived them of their rights under the Treaty.
 
 
 6
 Cree Plaintiffs filed suit against the State and several of its officers on July 3, 1989. On June 1, 1991, the district court granted their motion for a preliminary injunction enjoining Defendants from issuing citations to Tiin-Ma Logging or its drivers for violations of the tonnage licenses under RCW § 46.16.070 and the log tolerance permits under RCW § 46.44.047. Wheeler Logging filed suit on September 8, 1992 and the district court subsequently issued a preliminary injunction similar to the Cree injunction. The district court consolidated the cases on March 6, 1993.
 
 
 7
 After the court ordered the individual Plaintiffs to show cause why their claims should not be dismissed under the Tax Injunction Act, 28 U.S.C. § 1341, the district court granted the Yakama Nation's motion to intervene as a party-plaintiff in both the Cree and Wheeler actions. It also dismissed the individual Plaintiffs' claims challenging the financial obligations under the truck licensing and permitting laws, holding that it lacked subject matter jurisdiction under the Tax Injunction Act.[2]
 
 
 8
 In late 1994, the district court held that prior decisions regarding the Nation's fishing rights under Article III, paragraph 2, of the Treaty governed the meaning of the term "in common with" in the public highways clause, Article III, paragraph 1, of the Treaty. Cree v. Waterbury, 873 F.Supp. 404 (E.D.Wash.1994). Accordingly, it further held that, under the Treaty, the Yakama Nation and its members retained the right to travel the State's public highways without paying user fees while hauling tribal goods. Id.
 
 2. Prior Appeal to the Ninth Circuit[3]
 
 9
 Defendants appealed the district court's ruling on the Treaty interpretation issue and this court reversed. Cree v. Waterbury, 78 F.3d 1400, 1404 (9th Cir.1996). We held that the term "in common with" in the fishing right cases did not, by itself, define the nature of the public highways right. We directed the district court to undertake "[a] factual investigation into the historical context and the parties' intent at the time the Treaty was signed [in order to] determine the precise scope of the highway right." Id. We then remanded the case to the district court with instructions to "examine the Treaty language as a whole, the circumstances surrounding the Treaty, and the conduct of the parties since the Treaty was signed in order to interpret the scope of the highway right." Id.
 
 3. District Court Proceedings on Remand
 
 10
 a. Factual Inquiry
 
 
 11
 On remand, the district court held an extensive evidentiary hearing on the issue of the intent of the parties to the Treaty. It considered the testimony of three expert witnesses, two Plaintiffs and two State employees, along with numerous exhibits. See Yakama Indian Nation, 955 F.Supp. at 1236.
 
 
 12
 Plaintiffs presented two expert witnesses. The first, William Yallup, a full-blood Yakama Indian, has deep ties to the Yakama Nation going back to those who were present when the Treaty was negotiated. For 25 years he has served on the Yakama Nation Executive Committee and from 1985-90, he served as its Director and Cultural Specialist. Mr. Yallup testified as to the meaning of the Treaty to the Yakamas. Id.
 
 
 13
 Plaintiffs also offered the testimony of Dr. Deward Walker, an anthropologist who is an expert in ethnology, the comparative interpretation of cultures, based on their history, structure and functioning. Dr. Walker has spent his entire career studying the culture of North American Indian tribes and has been working with the Yakama Nation since the 1950's. He has authored several publications about the Plateau Indians which relate to the Yakama. Id. at 1236-37.
 
 
 14
 Defendants presented the testimony of Dr. Kent Richards, a professor of history at Central Washington University. Dr. Richards is an expert on Isaac I. Stevens, the Territorial Governor of Washington at the time of the Treaty. Dr. Richards was asked to examine the Yakama Treaty in the context of United States Indian policy at the time it was negotiated--the mid 19th Century--and in the context of previous treaties. He was asked particularly to examine the public highways clause and how that clause was carried out and interpreted after the Treaty. Dr. Richards based his opinions almost exclusively on his review of written sources; he did not speak with any Yakama members. He relied upon primary sources generated by participants or observers at or near the time of Treaty negotiations. Id. at 1237.
 
 
 15
 On the basis of this extensive record, the district court examined the importance of the Treaty to the Yakamas, the historical context of the Treaty, the Treaty negotiations at the Walla Walla Council, and the actions of the parties since the Treaty. Id. at 1237-46. It considered Mr. Yallup the ultimate expert in this proceeding, stating that it viewed his testimony with "considerable respect." Id. at 1237. On the importance of the Treaty to the Yakamas, the court noted that both of Plaintiffs' experts testified as to the Yakamas' sacrosanct view of the Treaty. The court found that "[t]he treaty embodies spiritual as well as legal meaning for the tribe; it enumerates basic rights secured to the Yakamas that encompass their entire way of life. Thus, each provision in the Treaty, including Article III, paragraph 1, has special meaning." Id. at 1238.
 
 
 16
 Turning to the Treaty's historical context, the district court first examined the significance of travel to the Yakamas, terming travel "an essential component of the Yakamas' way of life". To the Yakamas, travel was significant for many reasons, including trade, subsistence, and maintenance of religious and cultural practices. Id. The court emphasized that the intrinsic connection between trade and religion for the Yakamas could only be facilitated through travel. Travel was also absolutely necessary for the Yakamas to maintain their fishing practices which were and remain of paramount importance to the tribe. Id. at 1239. The district court noted that Governor Stevens knew of the significance of travel to the Yakamas when he entered into Treaty negotiations, as demonstrated by reports made to Stevens by his deputy and statements made to the Yakamas during the Treaty negotiations. Id. at 1240.
 
 
 17
 The district court then examined pre-Treaty contacts between the Yakama and whites, finding that until the 1850's the Yakamas' contact with whites was mostly limited to encounters with explorers, traders and missionaries. The court found that Governor Stevens was under tremendous pressure to negotiate treaties quickly with eastern Washington tribes, because lands occupied by them were important in settling the Washington Territory and the government sought to avoid hostilities between whites and Indians. The court found that Stevens needed access through Yakama land to construct roads for settlers and a railroad route. For this reason, the Yakamas were considered of great importance to Stevens and the United States. Id. at 1240-41.[4]
 
 
 18
 Governor Stevens sent several delegates to visit the Yakamas prior to Treaty negotiations. Captain George McClellan, commanding officer of the Western Division of the Pacific Railroad Exploration, spent several weeks with the Yakamas and told them that Stevens would be coming in the next year or so to discuss a Treaty. McClellan viewed the Yakamas differently from other tribes in eastern Washington because their country was to become a thoroughfare for the whites and realized the importance of making a good impression on the Yakamas. Id. at 1241. Before Treaty negotiations began, Stevens sent two other delegates to visit with the Yakamas and prepare them for negotiations. Id. at 1242.
 
 
 19
 The parties agreed that the Treaty minutes accurately capture what Governor Stevens and General Joel Palmer told the Yakamas at the Treaty negotiations at the Walla Walla Council in 1855. Id. Governor Stevens began the negotiations by expressing the government's desire to improve the lifestyle of tribal members and assure peace. To this end, he resolved to protect the Indians from "bad white men" if the tribes agreed to live within designated reservations. Stevens promised that if the tribes acquiesced to living on reservations, each one would include a blacksmith, a carpenter shop, a saw mill, a grist mill, along with an Indian agent to protect them from "bad white men." Palmer guaranteed that "[i]f we make a treaty with you and our Great Chief and his council approves it, you can rely on all its provisions being carried out strictly."[5]
 
 
 20
 The district court noted that the Yakamas' right to travel was repeatedly broached, most often by Stevens or Palmer. As explained to the Yakamas, entering into the Treaty would not infringe upon or hinder their tribal practices. Instead, the Treaty was presented as a means to preserve Yakama customs and protect against further encroachment by white settlers. Id. at 1244. There was no mention of any sort of restriction on hunting, fishing or travel other than the condition that the government be permitted to construct wagon roads and a railroad through the reservation. Overcoming some reluctance, the Yakamas agreed to the Treaty provisions on June 9, 1855. Id. at 1245.
 
 
 21
 Next, turning to an examination of the actions of the parties since the Yakama Treaty, the district court noted that the Yakamas continued to travel off-reservation years after ratification of the Treaty. The court noted that scant evidence was before it on the issue of the Yakamas' understanding of the claimed right to be free from state registration, permitting and licencing requirements when hauling tribal goods to market. Yakamas traveled on the State's public roads and highways without charge until the State began enacting statutes which imposed licensing and permitting fees. The district court found evidence that suggested that the Yakamas objected to roads being built through the reservation without tribal approval. It also found that individual Plaintiffs had previously brought suit in federal and state court challenging the State's imposition of licensing and permitting fees for their logging trucks. Despite court rulings in favor of the Yakamas, the State continued to impose those fees until the preliminary injunctions were issued in these cases.
 
 
 22
 b. District Court Rulings
 
 
 23
 First addressing the meaning of the term "in common with" in Article III, paragraph 1 of the Treaty, the district court found that neither party presented evidence suggesting that the term was ever explained to the Yakamas. Id. at 1246. The court found that the Yakamas understood this term to mean that no impediment was placed on their customary practice of travel or their right to travel to market. Id. at 1247. The court also found that "the Yakamas understood the term 'in common with' as common usage among Indians and non-Indians with no restrictions placed upon tribal members." Id. This finding is supported by the historical context of the Treaty, the negotiations themselves and Stevens' intent. Id. at 1247-49. The court rejected Defendants' arguments that "in common with" meant to place the Indians on an equal footing with whites. Id. at 1249-52. It also rejected Defendants' attack on the Yakamas' traditional system of travel. Id. at 1252-53. Next, the court rejected Defendants' assertion that the actions of the Yakamas, both pre- and post-Treaty, indicate that they did not expect or intend to be free of fees imposed for use of the public highways. Id. at 1253-55. Finally, the court rejected Defendants' contention that license fees allocated for preservation and maintenance purposes are permissible, notwithstanding the Yakamas' Treaty travel right. Id. at 1255-56.[6]
 
 II. JURISDICTION
 
 24
 The district court had jurisdiction over the Yakama Nation's claims under 28 U.S.C. §§ 1331 and 1362. It had jurisdiction over the individual Plaintiffs' challenges to RCW § 46.16.010 under 28 U.S.C. § 1331. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291.
 
 III. STANDARD OF REVIEW
 
 25
 We review de novo the interpretation and application of treaty language. See United States v. Washington, 969 F.2d 752, 754 (9th Cir.1992); Dillon v. United States, 792 F.2d 849, 852 (9th Cir.1986). Underlying factual findings, including findings of historical fact, are reviewed for clear error. United States v. Lummi Indian Tribe, 841 F.2d 317, 319 (9th Cir.1988). A finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); see also Lummi, 841 F.2d at 319. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 573, 105 S.Ct. 1504. We review de novo the trial court's application of law to facts. United States v. Skokomish Indian Tribe, 764 F.2d 670, 673 (9th Cir.1985).
 
 
 26
 We review for an abuse of discretion the trial court's equitable ruling that non-Indians may exercise Yakama Treaty rights. Cf. United States v. Washington, 520 F.2d 676, 688 (9th Cir.1975) (holding that district court's apportionment of fishing rights between tribes was an equitable decision reviewed for abuse of discretion).
 
 IV. DISCUSSION
 
 27
 The district court eloquently set forth its findings that travel was of great importance to the Yakamas, that they enjoyed free access to travel routes for trade and other purposes at Treaty time, and that they understood the Treaty to grant them valuable rights that would permit them to continue in their ways. We agree with the district court that, in light of those and its other findings, the Treaty clause must be interpreted to guarantee the Yakamas the right to transport goods to market over public highways without payment of fees for that use. We conclude that the State's challenges to the district court's decision and interpretation lack merit, for the reasons we now set forth.
 
 A. Interpretation of the Yakama Treaty
 1. Legal Framework
 
 28
 Supreme Court jurisprudence teaches that Indian Treaties must be interpreted as the Indians would have understood them.
 
 
 29
 The Indian Nations did not seek out the United States and agree upon an exchange of lands in an arm's-length transaction. Rather, treaties were imposed upon them and they had no choice but to consent. As a consequence, this Court has often held that treaties with the Indians must be interpreted as they would have understood them....
 
 
 30
 Choctaw Nation v. Oklahoma, 397 U.S. 620, 630-31, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970) (citations omitted).
 
 
 31
 It is our responsibility to see that the terms of the treaty are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the council, and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.
 
 
 32
 Tulee v. Washington, 315 U.S. 681, 684-85, 62 S.Ct. 862, 86 L.Ed. 1115 (1942) (citation omitted); see also United States v. Winans, 198 U.S. 371, 380-81, 25 S.Ct. 662, 49 L.Ed. 1089 (1905) ("we will construe a treaty with the Indians as 'that unlettered people' understood it, and 'as justice and reason demand ....' " (citation omitted)); Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 676, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) ("Fishing Vessel "); Jones v. Meehan, 175 U.S. 1, 11, 20 S.Ct. 1, 44 L.Ed. 49 (1899). Any doubtful expressions in the Treaty should be resolved in the Yakamas' favor. See Choctaw Nation, 397 U.S. at 631, 90 S.Ct. 1328.
 
 
 33
 Our prior opinion specifically acknowledged these canons of Indian treaty interpretation. See Cree, 78 F.3d at 1403 (citing Fishing Vessel ); see also United States v. Washington, 774 F.2d 1470, 1481 (9th Cir.1985) (citing, inter alia, Choctaw and Tulee ). We ultimately reject Defendants' appeal, in part because their arguments fail to embrace these principles and attempt to cabin our consideration to selective language from our prior opinion.
 
 2. Treaty Language as a Whole
 
 34
 Defendants contend that the Treaty language as a whole contradicts the trial court's interpretation that the purpose of the "public highways" clause was to preserve the Yakamas' ancient customs. First, they assert that the district court interpreted the highways clause as redundant to the fishing clause. According to Defendants, the district court made the same error it made in 1994 when it said that the "public highways" right was inseparable from the Treaty right of taking fish and this court directed it to give the "public highways" clause its own meaning. See Cree, 78 F.3d at 1404. The district court, however, clearly evaluated the public highways clause on its own and in terms of the Treaty as a whole.[7] We conclude that the district court specifically gave the "public highways" clause its own meaning. See Yakama Indian Nation, 955 F.Supp. at 1266 ("68. The language of Article III of the Treaty reflects the promises made by Stevens and Palmer in the Treaty discussions and guarantees to the Yakamas the right of free use of the public highways. P-1; P-2.").
 
 
 35
 Defendants next contend that the trial court disregarded the term "public highways" and failed to follow this court's instruction to determine how "the Indians understood their right to use government-built highways." See Cree, 78 F.3d at 1404. They contend that the evidence does not support an inference that the parties understood the right to use nonexistent "public highways" as preserving ancient Indian customs; instead, the language of the Treaty shows that the right was future-oriented. While Defendants make much of the district court's invocation of "ancient Indian customs," the district court expressly stated that the activities which were at issue were the Yakamas' right to travel for fishing, hunting, gathering and trade purposes. See, e.g., Yakama Indian Nation, 955 F.Supp. at 1266 (Findings of Fact 70, 73). Thus, the alleged inconsistency between "ancient Indian customs" and "future-oriented activities" dissolves. The district court found that the Treaty secured for the Yakamas the right to use future roads to access Puget Sound and to trade their goods. See id. at 1265, 1266 (Finding of Fact 67, 70).
 
 
 36
 Defendants next argue that the district court disregarded Treaty provisions designed to promote settlement. According to them, the plain language of the Treaty expressly limits Indians' off-reservation activities; therefore, the district court erred in holding that the Treaty entitles Yakamas to travel outside reservation boundaries "with no conditions attached." Id. at 1251. Defendants also contend that the district court disregarded the Yakamas' promise to respect settlers' government and property. According to Defendants, these facts suggest that the Indians understood that they would respect settlers' rules when they used settlers' property and the record contains no evidence that the Indians thought a different principle would apply to settlers' roads. According to Defendants, the district court disregarded Treaty provisions designed to foster assimilation in finding that the Treaty was presented as a means to preserve Yakama customs.
 
 
 37
 Here, Defendants present alternative factual bases to support their theory of the case. The district court did not clearly err in rejecting Defendants' interpretation. See Skokomish Indian Tribe, 764 F.2d at 673. It found that "Stevens did not communicate an intention to assimilate Yakamas with non-Indians or otherwise place the Yakamas on 'equal footing' with non-Indians." Yakama Indian Nation, 955 F.Supp. at 1266 (Finding of Fact 73). Although there is evidence to support Defendants' interpretation, we cannot say that viewing "the entire evidence" we are "left with the definite and firm conviction that a mistake has been committed." Anderson, 470 U.S. at 573, 105 S.Ct. 1504.
 
 
 38
 Moreover, Defendants contend that assimilationist parts of the Treaty are somehow inconsistent with an intent to preserve Yakama customs and that the government did not present the Treaty as a means to preserve Yakama customs. However, an examination of the Treaty and the context indicates that it contained both elements of assimilation and of preservation of Yakama customs. Certainly, Stevens "sold" the Treaty to the Indians as a means of preserving their customs.[8] The Treaty unquestionably contained elements of assimilation, such as the establishment of reservations and state-sponsored schools and mills on those reservations. In the end, the Treaty attempted to serve the purposes of the United States while remaining acceptable to the Yakamas. It is not surprising, therefore, that it contained multiple, and perhaps conflicting, purposes. Defendants fail to demonstrate how the existence of assimilationist elements in the Treaty proves that the "public highways" clause could not serve the function of preserving Yakama customs.
 
 
 39
 The Treaty provides that the Yakamas may use public highways "in common with citizens of the United States." The district court interpreted "in common with" to mean that the Yakamas could use the public highways together with citizens. Defendants claim that the district court stated that Yakamas can only be required to buy state licenses if Stevens told them in 1855 that "in common with" meant they must pay the same fees as non-Indians. The district court did not so state. It held that "[g]iven the fact that Stevens and his agents viewed the Yakamas and other tribes at the Council as unlearned savages, it is highly unlikely that he would have expected payment from them in order to maintain public highways." Yakama Indian Nation, 955 F.Supp. at 1251. Moreover, the district court held that "even if Stevens and the United States intended to limit the Yakamas' right to travel, that intent was not expressed at the Treaty negotiations." Id. The district court correctly looked at how the Indians would naturally have understood the terms of the Treaty and resolved any doubts and ambiguities in their favor. See Fishing Vessel, 443 U.S. at 658, 99 S.Ct. 3055; Tulee, 315 U.S. at 684-85, 62 S.Ct. 862; Winans, 198 U.S. at 380-81, 25 S.Ct. 662. After reviewing the Treaty Minutes, we agree with the district court that there is no evidence that Stevens or his delegates communicated any intent to the Yakamas to limit their right to travel.
 
 
 40
 Defendants further contend that the district court disregarded the phrase "citizens of the United States" in parsing the provision and that the provision should be interpreted in light of the constitutional right to travel. Defendants made the same argument to this court on the prior appeal. See Cree, 78 F.3d at 1404-05. We stated then:
 
 
 41
 We do not hold as a matter of law that the highway right must be interpreted to bar the State from imposing truck fees on the Yakama Indians to prevent the highway right from being mere surplusage. However, we cannot hold as a matter of law that the Treaty gave the Yakamas rights no greater than those of any non-Indian U.S. citizen.
 
 
 42
 Id. at 1405. We then instructed the district court to undertake a factual investigation to determine the precise scope of the highway right. Id.
 
 
 43
 The district court's interpretation of the term "in common with" is consistent with the Supreme Court's treatment of that term in the fishing rights cases. For example, in Tulee, the Court held that "despite the phrase 'in common with citizens of the Territory,' Article III conferred upon the Yakamas continuing rights, beyond those which other citizens may enjoy, to fish at their 'usual and accustomed places'...." 315 U.S. at 684, 62 S.Ct. 862 (emphasis added) (citation omitted). Moreover, in Winans, the Supreme Court rejected the argument that " 'in common with the citizens of the Territory' confers only such rights as a white man would have...." Winans, 198 U.S. at 379, 25 S.Ct. 662. See also Fishing Vessel, 443 U.S. at 679, 99 S.Ct. 3055 (holding that the right to take fish "in common with non-Indian citizens" gave the Indians a right to a class share of fish, not just an "equal opportunity" to catch fish on the same grounds as non-Indians). Thus, we decline Defendants' invitation to interpret "in common with" against the grain of Supreme Court precedent and in contravention of the district court's factual inquiry into the meaning of the language in the context of the Treaty. As the Supreme Court pointed out in Puyallup Tribe v. Department of Game, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968), "[T]o construe the treaty as giving the Indians 'no rights but such as they would have without the treaty' would be 'an impotent outcome to negotiations and a convention, which seemed to promise more and give the word of the Nation for more.' " Id. at 397, 88 S.Ct. 1725 (citation omitted).
 
 3. Historical Context
 
 44
 Defendants contend that the historical context of the Yakama Treaty does not support the district court's interpretation. They first contend that the district court refused to analyze evidence about the Yakamas' Treaty-time environment, such as toll roads and ferries. Defendants further assert that there is no evidence that any Indian expected to use settlers' roads without paying tolls. On the other hand, however, there is no evidence that any Yakama expected to pay such tolls.
 
 
 45
 Defendants contend that the district court disregarded federal Indian policy which was to assimilate Indians into American society. They are incorrect. The district court considered such evidence, but rejected it because it found that the Yakamas were unlikely to have understood the intricacies of United States Indian policy. Yakama Indian Nation, 955 F.Supp. at 1249-51. This finding is not clearly erroneous.
 
 
 46
 Defendants contend that there is no evidence that the Yakamas were of "vital importance" to the United States. They contend, correctly, that most of the exhibits do not even mention the Yakamas. They contend that the government did not accommodate the demands of the Yakamas more than it accommodated the demands of other tribes. While the Treaty Minutes do not demonstrate any special interest in the Yakamas on the part of Governor Stevens, the district court correctly focussed on the Yakamas' understanding of the public highways clause. It is worth noting that, although Governor Stevens negotiated with the Northwest tribes many treaties containing parallel provisions, only the treaties with the Yakamas and Nez Perce contained highway clauses like this one. The evidence clearly reveals the importance of travel to the Yakamas and Mr. Yallup's testimony shows how the Yakamas understood the Treaty and the public highways clause. Thus, whether or not there is evidence that the Yakamas were "of vital importance" to the United States is besides the point.
 
 
 47
 Defendants next contend that the United States could not have intended a promise of questionable constitutional validity because in the 19th Century it was thought by some that the United States could not constitutionally deprive the states of the right to collect tolls. See Smith v. Turner, 48 U.S. (7 How.) 283, 403, 12 L.Ed. 702 (1849) (McLean J.); see Searight v. Stokes, 44 U.S. (3 How) 151, 179-80, 181-82, 11 L.Ed. 537 (1845) (McLean, J., dissenting), (Daniel, J., dissenting); Chosen Freeholders v. New Jersey R. & Transp. Co., 24 N.J.L. 718, 728-30 (1853). We reject this contention because Defendants fail to explain how a debate among Justices of the Supreme Court would have affected Stevens' negotiations with the Yakama, thousands of miles away. There is no evidence that Stevens was even aware of this debate, much less that he received any instructions on this subject from his superiors. In fact, Stevens received only the most general instructions in negotiating the treaties with various Indian tribes. Accordingly, we reject this argument.
 
 4. Practical Construction
 
 48
 Defendants contend that the district court failed to execute our directive "to examine ... the conduct of the parties since the Treaty was signed" to discern their intent. Cree, 78 F.3d at 1405. They maintain that the conduct of the Yakama Treaty parties during the years since the Treaty was signed shows clearly their understanding that Yakamas would follow settlers' laws when they used off-reservation public highways.[9] Relying on Choctaw, Plaintiffs argue that practical construction has no importance. The truth lies somewhere in the middle. While examining the parties' actions may be helpful in construing a treaty, see, e.g., Hagen v. Utah, 510 U.S. 399, 411, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994), in this case, post-Treaty activity is inconclusive. Defendants are correct that the Yakamas did not challenge off-reservation road fees for many years. The proper focus, however, is on the type of tax at issue here. The most salient point is that no Indian hauled tribal timber off-reservation until 1978. Thus, the post-1978 period is the most relevant period of inquiry. Indians began challenging the fees at issue here in 1981. They have asserted their rights under the Treaty, as they understand them, in a timely manner.
 
 B. Evidentiary Challenges
 1. Pretrial Order Violation
 
 49
 Defendants first contend that the district court relied on speculation and extra-record hearsay instead of admissible evidence. Specifically, they contend that the district court violated a pretrial order which permitted the use of the Treaty Minutes contained in a book, but barred the use of editorial comments contained on this copy of the Minutes, as they were not part of the official minutes. Even if there were error on this point, it was harmless. See Fed.R.Civ.P. 61; 28 U.S.C. § 2111. Defendants have failed to show how this asserted error affected their substantial rights. See, e.g., Rogers v. Raymark Indus., Inc., 922 F.2d 1426, 1432 (9th Cir.1991) (holding that improper violation of pretrial order by admitting excluded evidence was harmless error). The district court relied on these sources in two footnotes in the course of a 100-page opinion. Any error did not affect the outcome of the district court proceedings and was therefore harmless.
 
 2. Evidentiary Errors
 
 50
 Defendants next contend that the district court committed numerous evidentiary errors which led it to interpret the Treaty erroneously. First, they maintain that the district court improperly relied on hearsay--specifically the testimony of William Yallup--to interpret the Treaty.[10] We reject this contention because Mr. Yallup testified as an expert witness; therefore, his testimony was not subject to the strictures of Federal Rules of Evidence 602 and 803. See Fed.R.Evid. 703.
 
 
 51
 Defendants also challenge the district court's "undue reliance" on Mr. Yallup's testimony. They assert that tribal-elder testimony about ancient events has limited evidentiary force because "testimony of tribal elders may not be 'the most accurate and authoritative data.' " United States v. Washington, 730 F.2d 1314, 1317 (9th Cir.1984) (citations omitted). However, appellants take the above statement out of context as the Washington decision literally dealt with the interpretation of data. See id. at 1317-18 (issue before the court was whether the Makah Tribe's usual and accustomed fishing grounds extended 100 miles offshore in 1855). In contrast, the issue in this case is the parties' understanding of the Treaty language, a far less precise issue.
 
 
 52
 Testimony of this sort by Yakama elders has been sanctioned for over twenty years. See United States v. Washington, 384 F.Supp. 312, 350 (W.D.Wash.1974), aff'd, 520 F.2d 676 (9th Cir.1975) (holding that the oral testimony of Yakama tribal members educated in tribal history and customs is found by the court to be reasonable and credible factual data regarding relevant aspects of Yakama Indian life and of the intentions and understandings of the Indian representatives present at Walla Walla).[11] The district court was entitled to accord Mr. Yallup's testimony preference over that of the other experts. See Skokomish Indian Tribe, 764 F.2d at 673 ("the findings of a district judge, made in reliance on controverted expert testimony, will not be disturbed unless clearly erroneous") (citation omitted). Further, it is clear from Judge McDonald's meticulous opinion that he based his findings of fact on the testimony of all three experts, as well as on the 129 exhibits which he reviewed. See Yakama Indian Nation, 955 F.Supp. at 1267.
 
 
 53
 Defendants also impugn the testimony of Dr. Walker because he contacted members of tribes with an interest in this case as the trial date neared and because prior to this litigation Dr. Walker had never talked to them about road tolls, taxes, or licenses in relation to the Yakama and Nez Perce Treaties.[12] Defendants contend that Dr. Walker's opinion was based on recent hearsay and was therefore entitled to little value as an indicator of Treaty-time intent. Defendants waived this argument by failing to challenge the admissibility of Dr. Walker's testimony at trial. See City of Phoenix v. Com/Systems, Inc., 706 F.2d 1033, 1038-39 (9th Cir.1983). Moreover, Defendants' objection goes to the weight of Dr. Walker's testimony, a matter for the district court to consider, and not its admissibility. See United States v. Senchenko, 133 F.3d 1153, 1157 (9th Cir.1998). Accordingly, we reject this argument.
 
 C. Exercise of Treaty Rights by Non-Indians
 
 54
 Defendants contend that the district court abused its discretion in allowing non-tribal-member agents of the Yakama Nation to exercise rights under the Treaty. Defendants do not identify any specific order or provision which they challenge. We assume, however, that they contest the court's order that the "Treaty right to travel, although secured to the Yakama Indian Nation, can be exercised by its individual members, and any Yakama-owned and operated corporation or business which is tribally licensed." Yakama Indian Nation, 955 F.Supp. at 1260. Plaintiffs explain that some non-Indians were hired by Indians or Indian corporations to drive log trucks, a practice permitted by the Yakama Nation under its Tribal Employment Rights Ordinance (Testimony of Kip Ramsey). As Defendants do not contest the district court's ruling regarding tribal regulatory sovereignty, they have no basis to object to the manner in which the Yakama Nation elects to exercise this right through its employment ordinance. See United States v. Oregon, 787 F.Supp. 1557, 1570-72 (D.Or.1992), aff'd, 29 F.3d 481 (9th Cir.1994) (treaty rights belong to tribal entities who may administer or regulate the exercise of these rights). There was no abuse of discretion.
 
 V. CONCLUSION
 
 55
 A quest for historical truth is always a difficult undertaking. We are asked to journey back to Walla Walla in 1855 and discern the intentions of two radically different peoples who did not share the same language, culture or values. As the record of this case discloses, scholars have devoted their entire careers to this undertaking and have reached differing conclusions. The district court undertook a careful inquiry into the intentions of the parties at Walla Walla and, given the evidence, its interpretation is certainly plausible. We conclude that the district court's essential findings of fact were not clearly erroneous. On the basis of those findings, we agree with the district court's interpretation of the Yakama Treaty. Accordingly, the judgment is
 
 
 56
 AFFIRMED.
 
 
 
 *
 Honorable Robert M. Takasugi, Senior United States District Judge for Central District of California, sitting by designation
 
 
 [1]
 Article III in its entirety provides:
 And provided, That, if necessary for the public convenience, roads may be run through the said reservation; and on the other hand, the right of way, with free access from the same to the nearest public highway, is secured to them; as also the right, in common with citizens of the United States, to travel upon all public highways.
 The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with the citizens of the Territory, and of erecting temporary buildings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land.
 Treaty with the Yakamas, Art. III, 12 Stat. 951, 952-53 (1855).
 
 
 [2]
 The district court, however, did not dismiss those claims which challenged the licensing and permitting requirements in and of themselves, as opposed to the requirement that Plaintiffs must pay to obtain the licenses and permits
 
 
 [3]
 This was actually the second appeal to reach this court. The first appeal involved the issue of immunity of the State defendants. See Cree v. Washington, 990 F.2d 1256, 1993 WL 115230 (9th Cir.1993) (Table)
 
 
 [4]
 The court also noted that Stevens doubled as Chief Engineer of the Northern Division of the Pacific Railroad Surveys chartered by Congress to ascertain the most expedient transcontinental railroad route. 955 F.Supp. at 1240
 
 
 [5]
 Presumably, the "Great Chief" refers to the President while "his council" refers to Congress
 
 
 [6]
 The district court also held that, under Washington v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), the challenged fees were preempted by federal law because they are not apportioned to account for actual off-reservation travel. Yakama Indian Nation, 955 F.Supp. at 1257-60. Because of our disposition of the Treaty interpretation issue, we do not reach this apportionment claim
 
 
 [7]
 The relevant findings state:
 
 
 [62]
 Reading of the Treaty language as a whole reflects that the term "public highways" should be read with its common understanding, meaning a road open to all or for common usage
 
 
 [63]
 Stevens and his representatives, both prior to and at the Treaty negotiations, clearly indicated that the roads they were discussing with the Indians were "public" roads open to all the settlers. P-2; P-17, D-335 at pp. 4, 7, 11, 14,15; P-23; P-24, D-348
 Yakama Indian Nation, 955 F.Supp. at 1265.
 
 
 [8]
 For example, Stevens represented: "We do not want you to agree not to get roots and berries and not to go off to the buffalo. We want you to have your roots and to get your berries, and to kill your game. We want you if you wish to mount your horses and go to the Buffalo plains...."
 
 
 [9]
 Specifically, Defendants assert that Yakamas never claimed any exemption from off-reservation road taxes until the 1980s. They contend that the district court's finding that the Yakama Indians did not use roads to take goods to market is clearly erroneous. They further contend that the finding that "Yakamas traveled Washington's public roads and highways without charge" until the 20th century has no support in the record
 
 
 [10]
 In support of the contention that Mr. Yallup was not competent to render an opinion about Treaty-time understanding, appellants cite to Cermetek, Inc. v. Butler Avpak, Inc., 573 F.2d 1370, 1376-77 (9th Cir.1978). This case is not relevant as it addresses the interpretation of a contract rather than a treaty and does not involve expert testimony. See id
 
 
 [11]
 Were it otherwise, the history and culture of a society that relies on an oral history tradition could be brought before the fact finder only with the greatest of difficulty and probably with less reliability
 
 
 [12]
 Defendants also note that Dr. Walker's testimony conflicted with what the Nez Perce Tribe had previously written about the Nez Perce Treaty in a book that Dr. Walker had edited